No. 96-729

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 86

294 Mont. 144

980 P.2d 603

JOAN K. McCORMICK, f/k/a JOAN K. BREVIG,

Plaintiff/Respondent/Cross-Appellant,

v.

CLARK A. BREVIG,

Defendant/Appellant,

BREVIG LAND, LIVE AND LUMBER, a Montana General

Partnership Consisting of Joan K. Brevig and Clark A. Brevig,

Defendant/Respondent.

_____

CLARK A. BREVIG,

Third-Party Plaintiff/Appellant/Cross-Respondent,

v.

CHARLES BAILLY & COMPANY, P.L.L.P., a Minnesota professional

limited liability partnership, McGLADREY & PULLEN, L.L.P.,

a Minnesota limited liability partnership, (f/k/a McGLADREY,

HENDRICKSON & CO.), MONTE R. MALNAA, an individual,

JOAN K. McCORMICK, f/k/a JOAN K. BREVIG, as Personal

Representative of the Estate of Charles A. Brevig, et al.,

Third-Party Defendants/Respondents.

APPEAL FROM: District Court of the Tenth Judicial District,

In and for the County of Fergus,

The Honorable John R. Christensen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

David A. Veeder and Jolane D. Veeder; Veeder Law Firm, P.C.;

Billings, Montana

For Respondents:

Steven J. Harman; Brown, Gerbase, Cebull, Fulton, Harman & Ross, P.C.;

Billings, Montana (for Joan K. McCormick)

Calvin J. Stacey; Stacey & Walen; Billings, Montana

Thomas P. Johnson; Davis, Graham & Stubbs; Denver, Colorado

Robert R. Watson; Sidley & Austen; Chicago, Illinois

(for McGladrey & Pullen, LLP)

Thomas J. Shroyer and Peter A. Koller; Moss & Barnett; Minneapolis,

Minnesota; and Michael V. Anderson and V. Ann Liechty;

Anderson & Liechty; Billings, Montana

(for Charles Bailly & Co., P.L.L.P., and Malnaa)

Submitted on Briefs: April 2, 1998

Decided: April 27, 1999

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

## FACTUAL AND PROCEDURAL BACKGROUND

**¶1. In 1949, Charles and Helen Brevig were married, and they later had two children, Clark Brevig and Joan Brevig McCormick. In 1960, Charles purchased the Brevig Ranch outside of Lewistown from his parents. In 1971, Charles transferred his sole interest in the ranch by warranty deed to himself and Helen as joint tenants. Then, in 1972, Charles and Helen conveyed the ranch to Clark and Helen as joint tenants.**

**¶2. Charles and Helen divorced in 1977, at which time Helen conveyed her interest in**

the ranch to Charles in the property settlement agreement. Charles and Clark then owned the ranch property in equal shares. At this point, Charles and Clark began operating the ranch as Brevig Land, Live & Lumber, a partnership.

¶3. In 1977, Charles executed a new will. The main dispositive clause of the will devised all of his property, including his one-half interest in the ranch, to Clark and Joan in equal shares. Both Clark and Joan were aware of this clause.

¶4. In May 1979, Joan moved back to the ranch and purchased some land near it called the Downs Place. Thereafter, she began working on the family ranch which was owned by Charles and Clark.

¶5. Sometime in late 1979 or early 1980, Charles began dating Judy Knapp. Both Joan and Clark were concerned that Charles would marry Knapp and that she might someday inherit or claim an interest in the ranch. Charles, Joan, and Clark began discussing several different options, including the formation of a trust, to protect the ranch from Knapp.

¶6. On February 13, 1980, Joan and Monte R. Malnaa, an accountant, met with Billings attorney Gerald D. Christensen to discuss various options to keep the ranch in the family. One option was that Charles would create an irrevocable trust for certain property, naming Clark as the residual beneficiary and Joan as the trustee. The parties also discussed another option whereby Charles' interest in the land would be transferred to the ranching partnership and then Charles' interest in the partnership transferred to Joan.

¶7. On February 18, 1980, Malnaa forwarded to Christensen an outline of the proposed trust arrangement and a list of the partnership property as of January 1, 1980. Also included was the legal description of the ranch land which Clark and Charles owned in equal shares. Malnaa stated in the letter that his understanding was that the titles to all of the properties were to be put in the partnership name; Charles' partnership interest thereafter being transferred into the trust. There is no evidence that the list had an "Exhibit A" stamped on it. Malnaa also asked Christensen at that time to draft a basic partnership agreement for Brevig Land, Live & Lumber.

¶8. Pursuant to Joan's request, Christensen drafted a proposed trust agreement. It is

disputed whether the list of the partnership property prepared by Malnaa was received by Christensen before he drafted the document. The proposed trust agreement refers to an Exhibit A and further provides that the trust consists of both real and personal property as described in an attached Exhibit A.

¶9. On May 16, 1980, Christensen sent a letter to Joan including a copy of the proposed trust agreement. It is unknown whether an Exhibit A was attached to the trust when it was mailed by Christensen. Joan testified that she placed the letter and proposed trust agreement in a file cabinet at the ranch house.

¶10. Sometime in January or February 1982, Charles and Clark had a conversation about the future of the ranch. Clark was concerned about the ownership of the ranch and the possibility of Joan coming into an ownership position. Charles allegedly told Clark that he would not put Clark in business with Joan on the ranch and that he would take care of it.

¶11. Shortly thereafter, on April 16, 1982, the ranch was refinanced with the Federal Land Bank for $420,000. Joan co-signed for the debt and her income was necessary in order to obtain the loan.

¶12. On April 26, 1982, Charles and Joan executed a carbon copy of the draft "Irrevocable Trust Agreement" that Christensen had sent to Joan on May 16, 1980, in the presence of a notary public. Charles signed as the "Grantor" and Joan as the "Trustee." The trust provided that Charles would receive the income from the trust property during his lifetime and, upon his death, the trust property would pass to Clark. The trust also provided that it was Charles' intent to transfer the property described in an attached Exhibit A to Joan as trustee. Joan testified that she placed the signed trust agreement in a bank safe deposit box. She also testified that there was no Exhibit A attached to the trust agreement at the time of execution.

¶13. In June 1982, after receiving a copy of the trust document from Joan who was seeking his advice on it, Malnaa called Joan and told her that there were no assets in the trust without an attached Exhibit A. Therefore, the trust was a "phantom" or "dry" trust having no legal effect. Malnaa's notes stated that Joan would inform Charles but they would not tell Clark.

¶14. On July 30, 1982, a partnership agreement between Charles and Clark was

signed. However, it was backdated to January 1, 1978, to reflect the dates on which they first began to operate as a partnership. The agreement was drafted by an attorney in Christensen's firm. The partnership agreement set forth that the capital contribution of the partnership includes both real and personal property described more fully in an attached Exhibit A. The Exhibit A attached to the partnership agreement in Malnaa's files with the original stamp was miscollated. The first page describing the real property was repeated as the third page, and there was no page describing the personal property. The partnership agreement did not refer to the irrevocable trust agreement or require that the trustee of the irrevocable trust, Joan, execute the partnership agreement.

¶15. The partnership agreement provided:

On the withdrawal or death of either partner, the remaining partner shall have the option of either purchasing the withdrawing or decedent partner's interest at a value to be determined by independent appraisal, or to dissolve the business, liquidating the partnership assets and distributing the proceeds proportionally to the remaining partner and the withdrawing partner or the deceased partner's estate.

¶16. After Joan filed suit in this case, the original and both copies of the partnership agreement were located. The original found in Malnaa's records had the miscollated Exhibit A attached. Charles' copy of the agreement also had the miscollated Exhibit A attached. Clark's copy of the agreement was found without an attached Exhibit A.

¶17. Also on July 30, 1982, Joan removed the executed trust agreement from the safety deposit box and placed it in a file cabinet in the office at the Brevig Ranch. Clark resided at the Brevig Ranch and had access to the file cabinet.

¶18. Sometime in the summer of 1982, Charles received a loan from Central Montana Production Credit Association. As part of the loan transaction, Charles purchased a credit life insurance policy for the amount of $75,000 from Old Republic Life Insurance Company. Charles named Central Montana Production Credit Association as the creditor and Clark as the second beneficiary.

¶19. On October 28, 1982, Charles died. Malnaa provided certain services with respect to Charles' estate. He supervised the preparation of various federal and state tax forms. Clark and Joan were appointed co-personal representatives and probated

Charles' estate. Clark and Joan each received one-half of the estate. Because Charles' estate principally consisted of his 50% interest in the ranch and 50% interest in the Brevig partnership, Clark ended up owning 75% of the ranch assets and Joan owning 25%.

¶20. After the death of Charles, Clark was notified that Old Republic Life Insurance would pay policy benefits in two checks, one to Central Montana Production Credit Association for the outstanding loan balance, and a second payable to him for the residual amount of $73,631.87. Clark's proceeds were used to pay partnership expenses, and Charles' last medical and funeral expenses. Clark deposited the remaining proceeds with the partnership and received credit in his capital account.

¶21. A written partnership agreement was executed by Clark and Joan with Clark holding a 75% interest in the partnership and Joan holding the remaining 25% interest. They intended the document to be backdated to the date of Charles' death, October 28, 1982, but instead the document was dated October 28, 1983. The income tax return filed in 1982 for the partnership showed Clark as a 75% partner and Joan as a 25% partner.

¶22. In August 1986, Malnaa wrote to Joan and recommended that the partnership agreement be revised to reflect the method of adjusting interests based on capital contributions. Clark and Joan later signed an undated addendum reflecting an agreement to make adjustments in partnership interests based on varying capital contributions.

¶23. Joan remarried in December 1986, and later moved to Colorado. Clark and his wife, Gail, continued to live on the ranch and operate it.

¶24. In January 1988, Joan and her husband executed two deeds--a quitclaim deed and a warranty deed--to Clark. The deeds were dated December 31, 1987, and notarized on January 5, 1988. The deeds were left blank as to legal descriptions. The parties dispute the circumstances surrounding how Clark took possession of the deeds. Joan maintains that she wanted her name removed from the Federal Land Bank debt as a condition of completing and recording the deeds. Clark argues that there were no conditions. However, Joan does not dispute providing Clark with the deeds.

¶25. During the spring and summer of 1994, Clark and Joan, each represented by counsel, entered into negotiations for the transfer of the ranch and Downs Place into a trust to be used to pay off the existing mortgage and retain the ranch in the family. In a letter dated September 3, 1994, Joan told Clark that she was willing to be bought out at the appraised value for her interest. A meeting set up to negotiate a resolution was unsuccessful.

¶26. On September 19, 1994, Clark met with his attorney and requested that he fill in the legal descriptions on the deeds executed by Joan and her husband on December 31, 1987. His attorney did as he was requested. On September 23, 1994, Clark filed the warranty deed with the Fergus County Clerk and Recorder's office in Book 212, Page 654. No notice was given to Joan.

¶27. Clark testified by deposition on March 4, 1995, that he was reviewing records forwarded by his accountant, Russell Spika. Clark had requested these records through his attorney. While reviewing these records, Clark found a copy of the signed irrevocable trust agreement.

¶28. Later, Clark testified by deposition and in affidavit that he discovered the original, executed trust agreement in a manilla folder in the bottom drawer of a fire-resistant file cabinet at the ranch. As he found it, the trust document consisted of eight pages. The first page was a cover letter dated May 16, 1980, from Christensen to Joan. Pages two through four consisted of the original trust agreement. An Exhibit A with three miscollated pages was attached to the proposed trust agreement. These miscollated pages were similar to the miscollated Exhibit A attached to the July 30, 1982, partnership agreement. This Exhibit A did not refer to a Brevig partnership interest but rather assets owned individually by Charles and Clark and operated by the partnership.

¶29. It is undisputed that no specific transfers of real property were ever made in any fashion to the Brevig partnership. It is further undisputed that there were no transfers by deed, bill of sale, assignment, or otherwise executed by Charles during his lifetime to specifically transfer any assets into the irrevocable trust.

¶30. Joan filed suit against Clark and their partnership, seeking a partnership accounting and dissolution. Clark answered the complaint and filed a counterclaim against Joan for fraud, deceit, negligent misrepresentation, and to quiet title. Clark

also filed a third-party complaint against McGladrey & Pullen, L.L.P., formerly known as McGladery, Hendrickson & Company, Charles Bailly & Company, P.L.L.P., and Monte R. Malnaa for professional negligence. The third-party complaint also included a claim against Joan for breach of fiduciary duty.

¶31. Joan moved for partial summary judgment in relation to Clark's counterclaim and third-party complaint. Joan requested that the court find that the trust dated April 26, 1982, was never created and, therefore, was invalid, that certain deeds executed by her and her husband dated December 31, 1987, and notarized January 5, 1988, were invalid to convey title, and that oral promises by Clark's family to transfer the ranch to Clark are barred by the statute of frauds and statute of limitations.

¶32. Clark moved for partial summary judgment on the issue of liability as raised in his counterclaim and third-party complaint against Joan. Clark also moved for partial summary judgment on the issue of liability against third-party defendants Malnaa, McGladrey, and Charles Bailly (Accounting Defendants) on his claim for professional negligence.

¶33. On April 29, 1996, the District Court held a hearing on both Joan's motion for partial summary judgment and Clark's motion for partial summary judgment against Joan. On June 14, 1996, the court entered an order, along with a supporting memorandum, which granted partial summary judgment to Joan on her claims and denied Clark's motion for partial summary judgment against Joan. The court also dismissed Clark's claims of fraud, deceit, negligent misrepresentation, and breach of fiduciary duty against Joan.

¶34. The Accounting Defendants also moved for summary judgment on all claims asserted against them by Clark. On August 1, 1996, the District Court held a hearing on pending motions for summary judgment related to the Accounting Defendants. On August 19, 1996, the court entered an order, along with a supporting memorandum, granting partial summary judgment to the Accounting Defendants and denying Clark's motion for partial summary judgment. First, the court denied Clark's motion for partial summary judgment on liability against the Accounting Defendants. Second, the court granted the Accounting Defendants' motions for summary judgment against Clark's claims regarding the April 26, 1982, trust agreement, the handling of the life insurance proceeds paid to Clark upon his

father's death, the partnership formation with Joan, and the cattle share agreement with Malnaa. Finally, the court denied without prejudice the Accounting Defendants' motions for summary judgment regarding the claims of Clark which arose out of the handling of the partnership accounts. The court ruled that Clark's claims regarding the partnership accounts will not be ripe for determination until the respective accounts of Clark and Joan have been settled.

¶35. On November 1, 1996, the District Court granted certification pursuant to Rule 54(b), M.R.Civ.P., and entered judgment with respect to the summary judgment orders. The court ordered all remaining issues before it to be stayed during the pendency of Clark's appeal from the court's prior orders. On November 6, 1996, Clark filed a notice of appeal. Clark appeals from the judgment entered on November 1, 1996, and all orders encompassed in that judgment. On November 29, 1996, Joan filed a notice of cross-appeal. Joan claims the District Court erred when it held that Clark's claims regarding the various trust theories were not barred by the statute of limitations. We affirm in part and reverse in part.

¶36. Other facts are referred to in our discussion as necessary.

¶37. The issues presented on review are as follows:

¶38. 1. Did the District Court err when it granted summary judgment to Joan by concluding that the Irrevocable Trust Agreement executed on April 26, 1982, is invalid and further concluding that no involuntary trust was created?

¶39. 2. Did the District Court err when it concluded as a matter of law that a deed given in blank as to the legal description is void unless authority to complete the description is given in writing?

¶40. 3. Did the District Court err when it granted summary judgment against Clark's claims based on professional negligence against the Accounting Defendants?

¶41. Because we have addressed and affirmed on the merits the District Court's order granting summary judgment in favor of Joan, there is no need to address the statute of limitation issues she raises by cross-appeal.

## STANDARD OF REVIEW

¶42. Summary judgment is a remedy which should not be granted when there is any genuine issue of material fact; the procedure should never be substituted for trial if a material factual controversy exists. *See* Rule 56(c), M.R.Civ.P.; *Payne Realty and Housing, Inc. v. First Sec. Bank of Livingston* (1992), 256 Mont. 19, 24, 844 P.2d 90, 93.

¶43. The party seeking summary judgment has the burden of demonstrating a complete absence of any genuine factual issues. *See D'Agostino v. Swanson* (1990), 240 Mont. 435, 442, 784 P.2d 919, 924. This Court looks to the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to determine the existence or nonexistence of a genuine issue of material fact. *See Ulrigg v. Jones* (1995), 274 Mont. 215, 218-19, 907 P.2d 937, 940. The party opposing summary judgment must present material and substantial evidence, rather than merely conclusory or speculative statements, to raise a genuine issue of material fact. *See B. M. by Berger v. State* (1985), 215 Mont. 175, 179, 698 P.2d 399, 401.

¶44. This Court reviews an order for summary judgment by utilizing the same criteria used by a district court initially under Rule 56, M.R.Civ.P. *See Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903; *In re Estate of Lien* (1995), 270 Mont. 295, 298, 892 P.2d 530, 532. Furthermore, on review, all reasonable inferences that might be drawn from the offered evidence should be drawn in favor of the party opposing summary judgment. *See Payne Realty and Housing, Inc.,* 256 Mont. at 25, 844 P.2d at 93.

¶45. We note that Clark takes issue with the District Court's handling of the parties' competing motions for summary judgment. Clark argues that the District Court treated this matter more in the nature of a bench trial rather than a summary judgment proceeding. He alleges that the District Court acknowledged that various facts were in dispute, made specific findings on witness credibility, misstated that standard on summary judgment, resolved issues created by conflicting affidavits, and generally misunderstood its role in resolving the summary judgment motions.

¶46. Our review of summary judgment proceedings is *de novo.* Without commenting on Clark's allegations in this regard, we will apply the proper summary judgment standards in our review of the record, most important of which is drawing all reasonable inferences from the offered evidence in Clark's favor.

# ISSUE 1

**¶47. Did the District Court err when it granted summary judgment to Joan by concluding that the Irrevocable Trust Agreement executed on April 26, 1982, is invalid and further concluding that no involuntary trust was created?**

**¶48. Clark claims that the District Court erred by concluding that the Irrevocable Trust Agreement executed on April 26, 1982, is invalid. First, Clark contends that according to Montana law in effect in 1981, no transfer of property from a trustor to a trustee is required to create a trust. Alternatively, Clark argues, a genuine issue of material fact exists as to whether Charles attached Exhibit A to the trust sometime before his death, thereby making a specific transfer of property into the trust to fund it.**

**¶49. In a lengthy memorandum in support of its order granting Joan's motions for partial summary judgment, the District Court ultimately concluded that the trust executed on April 26, 1982, is invalid. First, the District Court addressed the issue of whether to apply the 1989 Trust Code or the statutory trust provisions in effect in 1981 when deciding issues relating to the validity of the trust dated April 26, 1982. Section 72-33-102, MCA, provides that after September 30, 1989, the new trust code applies to all trusts regardless of when they were created unless a court believes that application of particular provisions of the 1989 Trust Code "would substantially interfere with the rights of the parties and other interested persons," in which case, the new trust code does not apply and prior law controls. The District Court concluded that the provisions of §§ 72-20-101 through -501, MCA (1981), apply to the trust agreement involved in this dispute because the application of the 1989 Trust Code would substantially interfere with Clark's rights pursuant to the law in effect in 1981. On appeal, the parties do not dispute this conclusion and we agree that the 1981 law controls the issues presented here.**

**¶50. In applying the 1981 trust statutes to the facts in this case, the District Court concluded that no voluntary or express trust was created under § 72-20-107, MCA (1981). In summary, the court determined that Charles did not intend to be bound by the trust agreement because, first, there was no evidence that an Exhibit A was attached to the trust agreement at its execution on April 26, 1982, and second, after the signing of the trust agreement, Charles continued operating the partnership and ranch as if no trust existed. Next, the court determined that, pursuant to Montana's**

statute of frauds, no transfer of real property is valid without an instrument in writing subscribed by the party granting the transfer. Therefore, Charles could not orally transfer his 50% interest in the partnership to the trust because transfers of personal property interest which are funded by real property interest must be in writing.

¶51. The following statutes governed the creation of a voluntary trust in 1981.

**72-20-107. Voluntary trust - how created as to trustor.** Subject to the provisions of 72-24-102, a voluntary trust is created, as to the trustor and the beneficiary, by any words or acts of the trustor indicating with reasonable certainty:

(1) an intention on the part of the trustor to create a trust; and

(2) the subject, purpose, and beneficiary of the trust.

**72-20-108. Voluntary trust - how created as to trustee.** Subject to the provisions of 72-24-102, a voluntary trust is created, as to the trustee, by any words or acts of his indicating with reasonable certainty:

(1) his acceptance of the trust or his acknowledgment, made upon sufficient consideration, of its existence; and

(2) the subject, purpose, and beneficiary of the trust.

¶52. According to these statutes, Clark contends that Charles manifested his intention to create a trust by signing the trust document on April 26, 1982; Joan indicated her acceptance of the trust and acknowledged the existence of the trust by also signing the trust agreement; and, the beneficiary of the trust, Clark, and the purpose of the trust, were identified in the trust agreement.

¶53. Clark maintains that there is sufficient evidence to present to the jury that the subject of the trust was identified with "reasonable certainty." He argues that the subject of the trust can be shown by "any words or acts." He points out that Malnaa's notes from his 1980 meeting with Joan establish that the trust corpus was

to be Charles' 50% partnership interest. He also points to the following evidence to further establish the trust corpus with reasonable certainty: (1) In early 1982 Charles told Clark that he would not put him in business with his sister and he would "take care of it;" (2) Charles told Judy Knapp on numerous occasions that he would receive the income from the ranch until he died and then he intended to give the ranch to Clark; (3) Charles purchased life insurance for Clark's benefit to assist in the operation of the ranch after his death; (4) Joan told Clark that it was Charles' wish for Clark to have the ranch; and (5) the original trust agreement was found with Exhibit A attached to it. Clark states that the above facts are undisputed.

¶54. Clark further argues that no transfer of property was required to create a trust under the 1981 trust code. The 1981 Trust Code only required "any words or acts" by the trustor which indicate with reasonable certainty an intention to create a trust, and the subject purpose, and beneficiary of the trust.

¶55. Joan counters that intent alone is not sufficient to create an express trust; there must be an actual transfer of property to a trust to create a valid trust. In this case, she argues that a transfer document, separate and distinct from the trust agreement itself, is required to fund the trust. Furthermore, she contends that because Charles' interest in the ranch partnership is an intangible asset, it must be transferred by means of an assignment to her as the trustee. She concludes that there is no evidence that Charles assigned his partnership interest to her to be held in trust for Clark.

¶56. Section 72-20-107 (MCA), 1981, required that for a voluntary trust to be created there must be words or acts of Charles which indicate with reasonable certainty both his intention to create the trust, and the subject, purpose, and beneficiary of the trust. Likewise, for a voluntary trust to be created, the trustee, in this case Joan, must by any words or acts indicate with reasonable certainty her acceptance of the trust and the subject, purpose, and beneficiary of the trust. In *In re Marriage of Malquist* (1988), 234 Mont. 419, 763 P.2d 1116, we reiterated the burden of proof required to prove the existence of a trust according to Montana law. We held that "the party who asserts the existence of a trust has the burden of proving its existence and contents by 'evidence unmistakable, clear, satisfactory and convincing.'" *Malquist*, 234 Mont. at 422, 763 P.2d at 1118.

¶57. The first element which must be established, therefore, is whether Charles, through words or acts, indicated with reasonable certainty his intention to create a

trust. The District Court based its conclusion that there was no evidence establishing that Charles intended to be bound by the trust agreement on the fact that Charles operated the partnership and his interest in the ranch as if no trust agreement existed. The District Court also concluded that according to the terms of a subsequently executed partnership agreement between Charles and Clark, it is clear that Charles considered himself as holding a 50% interest in the partnership. The partnership agreement was drafted so that if Charles were to die, Clark would have the option of either purchasing his share or dissolving the business, liquidating and distributing the proceeds proportionally to the partner's interest. The District Court concluded that such a provision in the partnership agreement is totally inconsistent with Clark's argument that Charles had earlier executed and funded a voluntary trust in which Clark would receive, as beneficiary, all of Charles' partnership interest upon Charles' death. Once assets are transferred to an irrevocable trust, the trustee, Joan in this case, takes complete control of those assets and is the only person who has the legal right to manage the trust assets. The land at issue was still in Charles' name and he continued to deal with the banks and the public as if he was a partner who managed the partnership property.

¶58. Resolving all factual inferences in Clark's favor, we do not necessarily agree with the District Court that the signing of the partnership agreement was inconsistent with the irrevocable trust. As Clark points out, Charles and Clark backdated the partnership agreement so that it predated the irrevocable trust and, therefore, was consistent with the trust. Although Charles' actions after executing the trust document were arguably contradictory, the issue of his intent should have more properly been resolved by a jury.

¶59. The second element which must be established for the existence of a valid voluntary trust is whether Charles, by his words or acts, indicated with reasonable certainty the subject, purpose, and beneficiary of the trust. Our review indicates that the purpose and the beneficiary of the trust were clearly set forth in the trust document. Although the District Court only indirectly addressed the subject of the trust, it is clear from the court's opinion that it was concerned that it was not reasonably established.

¶60. Malnaa's notes reflect that the subject of the trust or the corpus was to consist of Charles' 50% interest in the ranch partnership. His notes also indicate that both Charles and Clark were to transfer their respective interests in the real estate and

personal property into the partnership. This never occurred. In fact, it is clear that when the partnership agreement was ultimately signed, Clark and Charles still held that ranch property in their own names. It is therefore obvious that Malnaa's plans which were reflected in his notes were never carried out by Charles and Clark. In fact, it is important to note that there is nothing in the record to reflect that Charles ever personally met with a professional to discuss the creation of the trust arrangement.

¶61. More importantly, there is nothing in the trust agreement itself, which Charles signed, to indicate that the trust corpus was his partnership interest. The agreement simply refers to Exhibit A which was not attached. When the original trust was finally discovered with an Exhibit A attached, the matter is further confused. Exhibit A contains a legal description of the ranch land, rather than a description of Charles' 50% interest in the partnership. In any reconstruction of these events, it is unclear whether Charles intended to transfer his partnership into the trust or whether he intended to transfer his ownership in the real estate which he still retained.

¶62. Although the uncertainty regarding the subject of the trust might be left for jury determination, it underscores the need for some type of a transfer to make the trust valid. Notwithstanding the application of the 1981 trust statutes, we agree with Joan that in order for the trust to have been valid in this case, there must have been an actual transfer or assignment of the property involved. Clark relies on two Montana cases, *Malquist* and *McCaffrey v. Laursen* (1985), 215 Mont. 305, 697 P.2d 103, to support his position that a trust is valid even without a transfer. However, neither case supports Clark's position. Our decision in *Malquist* established that when no written assignment of the property to the trust was executed, the inclusion of the property on fiduciary income tax returns filed on behalf of the trust is insufficient to transfer the property into the trust. Likewise, in *McCaffrey* we held that the trustor's act of delivering to his attorney the signed promise of his son to act as trustee for the trustor's real property was a transfer sufficient to establish the existence of a trust. As with *Malquist*, *McCaffrey* supports the general rule that an actual transfer of title to the trustee is required to create a valid express trust.

¶63. Although it is not expressly stated in Montana's trust statutes, the universal rule established by common law is that in order to establish a trust, there must be a transfer of property. *See* Restatement (Second) of Trusts § 17 (1957). As is stated in § 32 of the Restatement (Second) of Trusts: "[I]f the owner of property makes a

conveyance inter vivos of the property to another person to be held by him in trust for a third person and the conveyance is not effective to transfer the property, no trust of the property is created." There is no evidence which indicates that Charles executed an assignment transferring his partnership interest into the trust.

¶64. This leaves us with the remaining question of whether the trust agreement itself would qualify as an instrument of conveyance to create a valid trust. The evidence in the record establishes that Exhibit A was not attached to the document at the time the trust was executed. Because there was no proper description of the property within the document itself, or attached as Exhibit A, the trust failed to convey the property at its execution.

¶65. Even later, when the trust agreement was found with Exhibit A attached, we conclude that because the document was not attached when the trust document was signed, the trust document, as it was found, could not have constituted a transfer of property. Clark argues that a jury, if given the opportunity, might determine that Charles was the person who attached Exhibit A. If the trust were validated by finding it with Exhibit A attached, it is important to note that the subject of the trust now is different than was identified in the accountant's notes. Exhibit A contains a legal description of the real property, not a description of Charles' interest in the partnership. If the trust agreement now acts as a conveyance of real property, simply attaching a legal description at some later date does not remedy the problem.

¶66. We conclude, as did the Supreme Court of Iowa in *In re Estate of Severson* (Iowa 1990), 459 N.W.2d 473, that an attachment of such an exhibit could have validated the trust document as an instrument of conveyance of the real property only if the person executing the trust document were to have redelivered, confirmed, ratified, or adopted the transfer. Without some further indication of the grantor's intent to divest himself of valuable real property, there is no guarantee that his wishes were actually followed. The record before us clearly indicates the original intention was that the subject of the trust was to be Charles' partnership interest. This interest is personal property. Charles never conveyed his real estate into the partnership. To allow a jury to speculate that Charles attached Exhibit A to the document before he died, which in turn would have effectively divested him of his real property, without some further evidence of his intent, would be a travesty. Therefore, even if a jury were to find that Charles attached Exhibit A sometime after he executed the trust, there is no evidence that he redelivered, confirmed, ratified, or adopted the transfer.

**¶67. The express trust at issue is invalid. Although there may be some question of Charles' intent and just what was the subject matter of the trust, the trust must fail as a matter of law because there was no proper conveyance into the trust of trust property. Even if a jury were to find that Charles attached Exhibit A before he died, there is no evidence that he redelivered or ratified the trust. Accordingly, we affirm the judgment of the District Court that the Irrevocable Trust Agreement executed on April 26, 1982, is invalid.**

**¶68. Clark also argues that, in the alternative, a constructive trust should be imposed to remedy Joan's alleged violation of various statutes relating to her obligations as a trustee.**

**¶69. Under the 1981 Trust Code two kinds of involuntary trusts existed: resulting and constructive. A constructive trust arose under the following circumstances:**

**72-20-111. Involuntary trust -- fraud, mistake, wrongful act.** One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act is, unless he has some other or better right thereto, an involuntary trustee of the thing gained for the benefit of the person who would otherwise have had it.

In these circumstances, the court simply "creates the trust to work an equitable result." *Eckart v. Hubbard* (1979), 184 Mont. 320, 326, 602 P.2d 988, 991. Clark argues that there is sufficient evidence to submit to a jury that Joan gained an interest in the Brevig ranch and other partnership property through fraud, violation of trust, and other wrongful acts. In summary, Clark claims that Joan's failure to disclose that the trust was not funded, allowed her to wrongfully acquire the ranch and partnership interest under Charles' will. In addition, he argues that the conduct on her part resulted in the violation of various statutory obligations imposed on trustees set forth in §§ 72-20-201 through -211, MCA (1981). Clark points out that there is nothing in the statutes which relieve Joan of her statutory obligations, even if the trust is unfunded.

**¶70. The District Court concluded that according to the facts presented it would be inequitable, as a matter of law, to impose a constructive trust. The court further concluded that an invalid trust is a trust that does not exist and, therefore, imposes no duties on the named trustee to take the actions which Clark claims should have been taken. The court also noted that it was uncontroverted that Joan advised**

Charles before his death that the trust was invalid and ineffective. Therefore, viewing the evidence in a light most favorable to Clark, both Joan and Charles kept information from Clark that the trust was unfunded.

¶71. It is important to note that Joan took title to the ranch and partnership property pursuant to a validly executed will. There is no suggestion that Charles was not competent to execute his will. Under the circumstances, we agree with the District Court that Joan had no affirmative duty to inform Clark that the trust was invalid. We also agree with the District Court that it would not be appropriate to subject Joan to the statutory obligations of trustees when no trust ever came into existence. Viewing the facts in a light most favorable to Clark, we agree with the District Court that by any interpretation there is simply no evidence in the record to justify submitting these issues for jury determination. Accordingly, we affirm the District Court's grant of summary judgment in favor of Joan on the constructive trust issue, as well as the issue of Joan's violation of trust statutes.

## ISSUE 2

¶72. Did the District Court err when it concluded as a matter of law that a deed given in blank as to the legal description is void unless authority to complete the description is given in writing?

¶73. Our standard of review relating to conclusions of law is whether the trial judge's interpretation of the law is correct. *See Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686; *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

¶74. In this case, Joan and her husband executed two blank deeds, one warranty and the other quitclaim, and delivered them to Clark during the early part of 1988. The deeds were both dated and notarized. However, Joan did not fill in the legal description of the property to be conveyed. At the time, Clark did not attempt to record the deeds or ask Joan to fill in the legal description of the property to be conveyed.

¶75. Between 1988 and 1993, the partnership between Clark and Joan continued to operate. However in 1994, the parties entered into negotiations to resolve their differences and establish a method to place the partnership properties in trust for the

benefit of Clark's children. After many heated discussions, the negotiations between the parties broke down in 1994. Joan notified Clark that she wished to be bought out based upon an appraisal of the ranch property.

¶76. During the negotiations, the blank 1987 deeds were not mentioned. On September 19, 1994, after learning that Joan wanted to be bought out, Clark took the blank 1987 deeds to

his attorney and asked him to complete the legal descriptions on the warranty deed. His attorney agreed and, subsequently, Clark filed the warranty deed with the Fergus County Clerk and Recorder's office on September 23, 1994. No notice was provided to Joan.

¶77. On appeal, Clark argues that the District Court erred by concluding that the warranty deed that he filed on September 23, 1994, was invalid because he did not have written authorization from Joan to fill in the legal description. Clark contends that oral authority from the grantor is sufficient to allow a party to complete the legal description and record the deed. Therefore, Clark asserts a question of fact remains as to whether he had oral authority to complete the deeds. Joan counters that the District Court was correct in holding that a deed, left blank as to the legal description, is void unless authority to complete the deed is given in writing.

¶78. This case presents an issue of first impression in the State of Montana. This Court has not had occasion to address whether a deed signed and delivered by the grantor without a legal description is operative to pass title after the description has been filled in by the grantee. Both sides attempt to portray their position as constituting the "majority view" of other jurisdictions that have addressed the issue of recording a deed given in blank as to legal description. However, upon review, we determine that the few cases that address this issue do not provide a clear resolution but, instead, suggest two different approaches. The District Court held that written authorization is required to complete a deed which is blank as to a legal description. We agree.

¶79. Traditionally, courts have required a higher degree of formality with respect to deeds. When confronted with the exact issue faced in this case, the Georgia Supreme Court held that a grantor who delivers a signed deed, which contains no description of the property intended to be conveyed, cannot by parol contract authorize the

**grantee to fill in the description.** *See Boyd Lumber Co. v. Mills* **(Ga. 1917), 92 S.E. 534. The court based this rule on** *Gilbert v. Anthony* **(Tenn. 1821), 1 Yerger 69, and quoted from it the following:**

Deeds are evidence of a higher nature than parol contracts, and there are great and important distinctions between the operation and effect of these different species of contracts. The reason of which is that, the first are supposed to be made upon greater deliberation and with greater solemnity; they are first to be written, by which they are exempted from that uncertainty arising from the imperfection of memory, to which unwritten contracts must always be exposed; they are then to be sealed by the party to be bound, and lastly, to be delivered by him which is the consummation of his resolution; none of this deliberation, and little of this solemnity is to be found in the signing and sealing of a blank piece of paper, on which anything may afterwards be written, and whether with or without the consent of the person who signed it, must depend entirely on oral testimony, subject not only to the uncertainty arising from the imperfection of human memory, but exempted from those checks on perjury, which would exist in the case of a deed regularly executed, which could only be altered by erasure or interlineation.

*Gilbert*, *1 Yerger at 69-70.*

**¶80. When distinguishing between deeds left blank as to legal description and deeds left blank as to grantee and consideration, the Washington Supreme Court observed that:**

[F]illing in a description stands upon an entirely different footing from that of filling in the name of a grantee in a deed otherwise lawfully executed. In the latter instance, the grantor has fully indicated his intention to divest himself of his title to certain definitely described property, and the filling in of the name of the grantee may be said to be but a fulfillment of that intention; in the former instance no such intention is indicated nor can it be inferred.

*Barth v. Barth* *(Wash. 1943), 143 P.2d 542, 549.*

**¶81. In** *Jones v. Coulter* **(Cal. Dist. Ct. App. 1925), 243 P. 487, the grantor signed two blank deeds and orally authorized the filling in of the legal descriptions of the properties and the name of the grantee. The court held that the deeds were void**

**because:**

[I]t has been definitely decided in [California] that under our statute of frauds the name of the grantor or grantee or a description of the property cannot be inserted by an agent for the grantor, in the absence of the latter, unless the agent's authority be in writing. If the authority of the agent not be in writing, his insertion of the name of the grantor or grantee or description of the property does not pass the title.

*Jones*, 243 P. at 490. See also Dahlberg v. Johnson's Estate (Idaho 1949), 211 P.2d 764.

**¶82. These courts have concluded that a deed left blank as to legal description is void to convey title unless authority to complete the deed is given in writing. We agree with this conclusion based upon Montana's statute of frauds and because of the formality required to execute a deed in order to convey title from the grantor to grantee.**

**¶83. Montana's statute of frauds states:**

No estate or interest in real property . . . can be created, granted, assigned, surrendered, or declared otherwise than by operation of law or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring it or by his lawful agent thereunto authorized by writing.

Section 70-20-101, MCA. According to the statute of frauds, the conveyance of an interest in real property must be in writing. It would violate the statute to permit the modification of a deed after delivery solely upon oral authority.

**¶84. We determine that, pursuant to Montana's statute of frauds, the authority to complete the legal description of property to be conveyed in a deed must be given in writing by the grantor if the legal description is blank. Therefore, we conclude that the District Court did not err when it ruled that the warranty deed filed by Clark on September 23, 1994, is invalid.**

ISSUE 3

**¶85. Did the District Court err when it granted summary judgment against Clark's**

claims based on professional negligence against the Accounting Defendants?

¶86. After Clark answered Joan's complaint and filed a counterclaim, he also filed a third-party complaint alleging professional negligence against Monte Malnaa and the two accounting firms for which Malnaa worked; McGladrey & Pullen, formerly known as McGladery, Hendrickson & Company; and Charles Bailly & Company. From January 1979, to January 31, 1986, Malnaa was employed by McGladrey in Billings. Since February 1, 1986, Malnaa has been a partner of Charles Bailly, a Minnesota professional limited liability partnership.

¶87. Specifically, Clark alleges that Malnaa negligently failed to inform him that his father had taken steps to create a trust of which Clark would be the beneficiary, but that his father had failed to complete all of the actions necessary to perfect the trust. If the trust had been established, Clark claims that he would have received all of his father's property through the trust, rather than half of the property through his father's will. Next, he alleges that Malnaa committed accounting malpractice concerning the handling of Charles' estate and certain matters relating to the partnership formed between him and Joan in 1982. Finally, Clark alleges that Malnaa breached a duty of fairness in connection with various partnership issues, including a cattle share agreement that Malnaa entered into with the Brevig Land, Live and Lumber partnership.

¶88. The District Court separated Clark's professional negligence claims into three categories. The first category, "Trust Claims," were the claims related to the Accounting Defendants' lack of communication with Clark about the April 26, 1982, trust agreement. The second category of claims, "Partnership Formation/Estate Claims," related to the Accounting Defendants' alleged role in the resolution of Charles' estate and in the creation of the Brevig Land, Live & Lumber partnership between Clark and Joan. Finally, the claims that related to the partners' contributions of assets to the partnership, the values placed on those assets for determining the partners' ownership interests, and other partnership and accounting issues that allegedly affected Clark's ownership interest in the partnership were lumped into a third category by the District Court called "Category 3 Claims." We will discuss each of these claims as framed by the District Court.

## Trust Claims

¶89. First, Clark alleges that the Accounting Defendants breached the applicable standards of care by failing to disclose the existence of the trust to Clark, giving legal advice as to the validity of the trust without Exhibit A attached, failing to recognize the conflict of interest in representing him, the trust, and the trustee, Joan, and at the same time agreeing to adhere to Joan's request not to tell Clark about the trust, failing to inform the attorney for the estate and the probate court of the existence of the trust, and failing to disclose the existence of the trust on the estate tax returns.

¶90. As stated above, we agree with the District Court that no valid trust was ever formed by Charles with respect to his partnership interest in the ranch or any other partnership assets. Clark claims that in the event that we were to find the trust invalid, his negligence claims against the Accounting Defendants would remain because his expert witnesses would testify that Malnaa had a duty to either tell Clark that the trust document existed, whether the trust was funded or not, and about its purported invalidity without Exhibit A, or withdraw from his accountant-client relationship with his current clients, Clark, the partnership, and the trust. Clark argues that because Malnaa did not do one or the other, he breached his professional duties.

¶91. The District Court discussed four separate grounds for granting the Accounting Defendants summary judgment and denying Clark's motion for partial summary judgment on the trust claims. First, the court determined that Malnaa, as Joan's alleged agent, had no duty to disclose the existence of the invalid trust because Joan, as the alleged principal, had no duty to disclose the invalid trust to Clark. Second, according to § 37-50-402, MCA, the court determined that Malnaa was precluded from discussing the trust agreement with Clark unless Malnaa received permission from Charles or Joan, his clients, or was ordered to disclose by a court subpoena. Third, the court ruled that Clark cannot demonstrate that Malnaa's failure to disclose the invalid trust agreement was the legal cause of a compensable injury. In other words, Clark cannot establish that the Accounting Defendants' conduct caused his alleged damage, the failure to receive the entire ranch upon Charles' death. Fourth, the court concluded that Clark's claim is barred by the applicable three-year statute of limitations pursuant to § 27-2-204(1), MCA.

¶92. The District Court's first basis for granting summary judgment in favor of the Accounting Defendants is that, Malnaa, as Joan's alleged agent, had no duty to disclose the existence of the invalid trust to Clark. This was consistent with the

court's reasoning that, since Joan had no duty to disclose, certainly her agent had no duty. Closely related is the court's second basis, that the "Privileged communications" statute (Section 37-50-402, MCA) precluded Malnaa from disclosing the existence of the invalid trust from Clark.

¶93. Clark argues, however, that he had a professional relationship with Malnaa during this period and, therefore, Malnaa was immersed in a clear conflict of interest. Clark argues that once Malnaa decided to represent clients with competing interests, he had a similar duty of disclosure to all of them.

¶94. At the very least, our review of the record raises a question of whether Malnaa had a professional relationship with Clark during the time period he was advising Joan that the trust was invalid. The District Court concluded that simply preparing tax returns for Clark would not be sufficient to establish a professional relationship. However, Clark asserted that he considered Malnaa as his accountant from 1982 until 1994 and that essentially Malnaa was advising the entire family unit in handling the various ranching affairs. We conclude that the question of whether Malnaa had a professional relationship with Clark during the period in question should have been left for a jury to decide. Should the jury decide that such a relationship did exist, then Malnaa owed a duty to his competing clients to either withdraw from representing them or obtain their permission to proceed, making full disclosures to everyone. Therefore, the first two reasons cited by the District Court would not be sufficient to support summary judgment in favor of the Accounting Defendants.

¶95. The third reason the District Court cited as a basis for summary judgment against the Accounting Defendants is that Clark could not establish that the failure of Malnaa to advise him of the invalid trust was a legal cause of his injury. The court reasoned that Clark can only speculate that he could have convinced his father to remedy the invalid trust had he been informed of the invalid trust prior to his father's death. We do not disagree with the District Court that speculative statements or assertions are not sufficient to raise a material question of fact. However, given the entire circumstances and the relationship of the various parties involved, a jury may reasonably find, without regard to speculation, that Charles had fully intended to create a valid trust. Had Clark been given the opportunity to discuss the invalidity of the trust with his father, a jury may reasonably conclude that Charles would have remedied the matter before he died. Therefore, we conclude that the District Court erred in deciding the causation issue as a matter of law.

¶96. The court's final basis for granting summary judgment to the Accounting Defendants is that Clark's claims were barred by the applicable statute of limitations. The court stated that the three-year statute of limitations bars Clark's claim of professional negligence against the Accounting Defendants with regard to the trust agreement.

¶97. Clark's claims against the Accounting Defendants are based on a theory of negligence. Pursuant to § 27-2-204(1), MCA, "the commencement of an action upon a liability not founded upon an instrument in writing is within 3 years." This Court has generally held that in tort actions the statute of limitations begins to run on the date of the plaintiff's injury. *See Kerrigan v. O'Meara* (1924), 71 Mont. 1, 7, 227 P. 819, 821; *see also Yellowstone Conference of United Methodist Church v. D.A. Davidson, Inc.* (1987), 228 Mont. 288, 294, 741 P.2d 794, 798. According to § 27-2-102 (1)(a), MCA, the date of a plaintiff's injury is the date the cause of action "accrues." Accrual is defined by that statute as:

(a) a claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action . . . .

Clark's alleged injury arises from his not receiving the entire ranch upon Charles' death. He claims that if he had been advised of the existence of the invalid trust agreement prior to the death of Charles, he may have been able to convince Charles to remedy the invalid trust to reflect his true intentions. Clark maintains he could have engineered a change in the disposition of Charles' interest in the ranch had he been advised of the invalid trust agreement. The District Court properly noted, however, that Clark would have only had the

opportunity to do so before the death of Charles on October 28, 1982. Therefore, the statute of limitations began to run on the date of Charles' death, October 28, 1982.

¶98. Pursuant to the general tort rule, Clark had three years from October 28, 1982, in which to file an action against the Accounting Defendants alleging professional negligence with regard to the trust agreement. However, Clark did not commence his third-party action against the Accounting Defendants until June 30, 1995. Notwithstanding, Clark asserts that his action was still timely.

¶99. In *Blackburn v. Blue Mountain Women's Clinic* (1997), 286 Mont. 60, 951 P.2d 1, we addressed an issue similar to the issue presented here. In *Blackburn*, the appellant alleged, among other things, negligence on the part of the Clinic and one of its counselors, Jane Doe, for the counselor's failure to inform Blackburn that, because she was HIV negative, her baby would not be born HIV positive and, therefore, that an abortion was unnecessary. *See Blackburn* (1997), 286 Mont. at 78, 951 P.2d at 11-12. Because Blackburn was not given this information by the Clinic counselor, she chose to have an abortion based upon advice given to her by a previous caregiver that her baby would be HIV positive. It was not until five years later when Blackburn consulted an attorney, that she learned of the misinformation. We determined that the elements of Blackburn's claims for negligence were present once she had the abortion and that her right to maintain an action on those claims was complete pursuant to § 27-2-102(1), MCA. *See Blackburn*, 286 Mont. at 70, 951 P.2d at 7. Blackburn's alleged damages, including the loss of her unborn fetus as well as ensuing emotional difficulties, were manifest at the time of the abortion procedure. Blackburn

maintained, however, that even if her injury and claim accrued earlier, the statute of limitations did not begin to run until five years later when she first consulted an attorney and learned that she had received erroneous medical information prior to her abortion. *See Blackburn*, 286 Mont. at 77, 951 P.2d at 11.

¶100. In *Blackburn*, we explained that § 27-2-102(3)(a), MCA, may toll the statute of limitations in a negligence case when the facts constituting the claim are self-concealing, thereby preventing their discovery by the plaintiff. *See Blackburn*, 286 Mont. at 78, 951 P.2d at 12. Section 27-2-102(3)(a), MCA, states:

(3) The period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:

(a) the facts constituting the claim are by their nature concealed or self-concealing;

We noted that, in the past, self-concealing injuries were found in the context of medical malpractice claims. *See Blackburn*, 286 Mont. at 78, 951 P.2d at 12. In 1987, however, the

Montana Legislature amended § 27-2-102, MCA, to address the unique problems presented by self-concealing injuries. *See* § 27-2-102(3), MCA. In doing so, the Legislature specifically exempted the application of § 27-2-102(3), MCA, to medical malpractice actions which are instead governed by the limitations period and tolling provisions codified at § 27-2-205, MCA. *See Blackburn*, 286 Mont. at 78, 951 P.2d at 12. Section 27-2-102(3)(a), MCA, protects plaintiffs against the harsh results of having their claims barred before they even know they exist. In *Blackburn*, we concluded that the negligent act alleged by Blackburn was the withholding of accurate medical information by the Clinic counselor, and that this alleged withholding of information, or nondisclosure of information, is by its nature, self-concealing. *See Blackburn*, 286 Mont. at 79, 951 P.2d at 12. We further concluded that the alleged facts upon which Blackburn's claim for negligence rested were, by their nature, self-concealing and, as a result, the very nature of her injury was self-concealing. We held that Blackburn could not have discovered that she underwent an unnecessary abortion until she learned that the counselor had withheld from her accurate medical information which Blackburn needed in order to make an informed decision regarding whether to obtain an abortion. *See Blackburn*, 286 Mont. at 79, 951 P.2d at 12.

**¶101. Pursuant to our decision in *Blackburn* and the tolling provision in § 27-2-102(3)(a), MCA, we conclude that the facts constituting Clark's claim against Malnaa are self-concealing. Although Clark's injury accrued on October 28, 1982, the date of Charles' death, Clark could not have discovered that he should have received the entire ranch upon Charles' death until he learned that Malnaa, his accountant, had withheld from him accurate information regarding the existence of the invalid trust agreement. Malnaa admitted in his deposition that he and Joan agreed not tell Clark about the invalid trust agreement. Clark maintains that he first learned of the trust on March 4, 1995. Had Malnaa disclosed to Clark that the validity of the trust was questionable prior to Charles' death, Clark would have had the opportunity to remedy the faulty trust.**

**¶102. As we discussed in *Blackburn*, a determination must be made regarding whether Clark exercised due diligence in discovering his claim as required by the tolling provision in § 27-2-102(3)(a), MCA. *See Blackburn*, 286 Mont. at 79, 951 P.2d at 12. A trier of fact must determine when Clark, through due diligence, should have discovered that information withheld by Malnaa caused him to not be awarded the entire ranch upon Charles' death.**

¶103. Based on the foregoing, we conclude that the facts constituting Clark's claim for negligence against Malnaa with regard to the existence of the trust were self-concealing as contemplated by the tolling provision of § 27-2-102(3)(a), MCA. At what point Clark discovered or should have discovered through due diligence the negligence of Malnaa is a question that must be submitted to a jury for determination.

¶104. Therefore, with regard to the trust claims we conclude that the District Court improperly granted summary judgment in favor of the Accounting Defendants.

## Partnership Formation/Estate Claims

¶105. Clark next argues that the Accounting Defendants committed acts of professional negligence in their handling of Charles' estate and the formation of the partnership between Clark and Joan. Clark claims that Malnaa did not advise him that pursuant to the express language of the partnership agreement he could have bought out Charles' interest in the ranch after his death and could have used Charles' life insurance proceeds to do so. Specifically, Clark alleges that Malnaa wrongly advised him that the life insurance proceeds from Charles' death, which were payable to Clark as the beneficiary, had to be split with Joan because they passed under Charles' will. Finally, Clark contends that Malnaa incorrectly prepared and filed both federal and state tax forms showing the 50/50 treatment of Charles' insurance proceeds.

¶106. The District Court stated four separate grounds for granting the Accounting Defendants summary judgment on the claims relating to the resolution of the estate and the formation of the partnership between Joan and Clark. First, the court concluded as a matter of law that Clark is presumed to know the contents of the written partnership agreement that he executed with Charles on July 30, 1982, including its "purchase on death" provision. Second, the court ruled that Malnaa does not have a duty to advise Clark about a partnership agreement that Malnaa was not responsible for drafting. Third, the court concluded that Clark cannot demonstrate that he had suffered any damages as a result of Malnaa's alleged mishandling of the life insurance proceeds on the tax form filings. Finally, the court concluded that Clark's claims regarding the handling of Charles' estate and the partnership formation are barred by the three-year statute of limitations applicable to negligence actions.

¶107. The District Court's first basis for summary judgment on these claims was that Clark was presumed to know the contents of the written partnership agreement that he executed with his father on July 30, 1982. The agreement included a "purchase on death" provision. Therefore, the court reasoned that regardless of any advice by Malnaa, Clark should have been aware that he had the right to purchase Charles' interest in the ranch which would have precluded the property from passing through the will.

¶108. Viewing the record in a light favorable to the party opposing summary judgment, however, we conclude that a jury might believe it reasonable for Clark to follow his professional's advice, despite the provisions of the partnership agreement. Clark offered expert testimony by affidavit to support his claims. Among other things, Clark maintains that Malnaa gave him bad advice indicating that the insurance proceeds had to be split with Joan because they passed under the will.

¶109. If anything is clear from this record, it is that everyone involved in these transactions was confused at some time or another about what was really going to happen with Charles' assets, the ranch and the estate. It is unclear if any of the parties involved in the multiple transactions had any understanding of the nature of the legal documents which were executed at various times. Therefore, we conclude that, as a matter of law, Clark's presumed knowledge of the "purchase on death" provision in the partnership agreement would not have been a proper basis to grant summary judgment in favor of the Accounting Defendants.

¶110. The District Court's second reason for granting summary judgment is that Malnaa had no duty to advise Clark concerning the partnership agreement which he did not draft. In our view, this is an overly restrictive view of Malnaa's involvement. It is clear that Malnaa was directly involved in the estate planning decisions of the Brevig family. Again, a jury may reasonably conclude that Malnaa breached his duties to Clark with regard to these claims.

¶111. The third reason cited by the District Court for granting the Accounting Defendants summary judgment regarding this category of claims is that Clark cannot demonstrate that he suffered any damages as a result of Malnaa's mishandling of the life insurance proceeds on the tax form filings. Again, a jury may properly view this differently. Clark argues that Malnaa negligently advised him that the life insurance proceeds had to be split equally with Joan and that he did not have

any choice but to enter into a partnership with her. Even though Clark ultimately received credit for the life insurance proceeds in the partnership account, he claims that Malnaa initially advised him that they had to be split. Clark maintains that had he known that the life insurance proceeds were legally his, he would have had enough money to purchase Charles' partnership interest and would not have entered into the partnership with Joan.

¶112. The last basis for supporting summary judgment in favor of the Accounting Defendants was that these claims are time barred. The statute of limitations began to run sometime in late 1983. At that time, Clark had three years in which to file an action against the Accounting Defendants for professional negligence with regard to the handling of Charles' estate and the formation of the partnership with Joan. However, Clark did not commence his third-party action against the Accounting Defendants until June 30, 1995.

¶113. The same reasoning that we applied to the trust claims pertains to these claims as well. The statute of limitations would be tolled if Clark can establish that Malnaa withheld information, or failed to disclose material facts to him during the relationship pursuant to § 27-2-102(3)(a), MCA. As we stated in *Blackburn* "[n]ondisclosure of information is, by its nature, self-concealing." *Blackburn*, 286 Mont. at 79, 951 P.2d at 12. Clark alleges that Malnaa did not advise him that pursuant to the partnership agreement he could have bought out Charles' interest in the ranch after his death and that he could have used the insurance proceeds to do so. Once again, we conclude that a jury must determine when Clark, through due diligence, should have discovered the nondisclosure of this information in order to calculate the date upon which the statute of limitations for this action began to run. Therefore, we reverse this District Court's grant of summary judgment in favor of the Accounting Defendants with regard to this category of claims as well.

Category 3 Claims

¶114. In Clark's motion for summary judgment, he disputes the handling of the partnership's books of account. Generally, he questions the accuracy of the accounting records and the valuation of the property contributed as capital by the partners, and disputes whether the partnership actually owns all of the assets reflected in its capital accounts. He also claims that the partnership suffered a loss from a cattle share agreement between the partnership and Malnaa.

¶115. The District Court determined that nearly all of Clark's Category 3 allegations were not ripe for adjudication. The District Court concluded that all claims relating to the partnership asset valuation, partner ownership shares, and partnership accounting cannot be resolved until the partners' accounts have been determined and it is known whether Clark has sustained any losses. The parties do not dispute this ruling on appeal. However, the District Court did rule on Clark's "cattle share" claim.

¶116. On May 1, 1986, Brevig Land, Live and Lumber executed a cattle share agreement with Malnaa. Pursuant to the agreement, Malnaa purchased cattle and bulls, paid taxes on the livestock, and agreed to supply labor for the operation of the herd. Brevig Land, Live and Lumber agreed to manage the herd, cover certain listed expenses, market the stock, and maintain herd records. The partnership split calves born of the herd, 60% to the partnership and 40% to Malnaa. Both parties testified that the agreement was profitable for the partnership and produced appropriate returns on Malnaa's investment.

¶117. Clark argued that it was unethical for Malnaa to go into business with the partnership because the partnership was one of Malnaa's clients. The District Court granted summary judgment to the Accounting Defendants with regard to Clark's cattle share claim. First, the court ruled that there was no basis for Clark's contention that is was unethical for Malnaa to go into business with a client. Moreover, the court said that it was undisputed that the cattle share agreement was consistent with industry custom and practice and that the venture was a financial success. Second, the court concluded that the claim based on professional negligence is barred by the three-year statute of limitations set forth in § 27-2-204(1), MCA, because the cattle share agreement was signed on May 1, 1986. Finally, the court ruled that Clark lacked standing to sue over the cattle share agreement because Clark personally pursued the action, rather than on the partnership's behalf.

¶118. We agree with the District Court that the three-year statute of limitations bars Clark's professional negligence claim with respect to the cattle share agreement. From the date the cattle share agreement was executed on May 1, 1986, Clark had three years to file a claim for professional negligence with respect to the cattle share agreement. However, Clark did not commence his third-party action against the Accounting Defendants until June 30, 1995, long after the statute of limitations had expired.

**¶119. The judgment of the District Court is affirmed in part and reversed in part. This matter is remanded for further proceedings consistent with this opinion.**

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.