DA 13-0007

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 319

DRAGGIN' Y CATTLE COMPANY, INC.,
and ROGER and CARRIE PETERS,

Plaintiffs and Appellants,

v.

LARRY ADDINK, and JUNKERMIER,
CLARK, CAMPANELLA, STEVENS, P.C.,

Defendants and Appellees.

APPEAL FROM:     District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV 11-87A
Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Timothy B. Strauch; Strauch Law Firm; Missoula, Montana

For Appellees:

G. Patrick HagEstad, Tim E. Dailey; Milodragovich, Dale &
Steinbrenner, P.C.; Missoula, Montana

Submitted on Briefs:   September 11, 2013
Decided:   October 29, 2013

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Draggin' Y Cattle Company, Inc. and Roger and Carrie Peters (collectively the Peters) appeal from the order of the Eighteenth Judicial District Court granting summary judgment to defendants Larry Addink (Addink) and Junkermier, Clark, Campanella, Stevens, P.C. (JCCS). The case arose from a failed § 1031 tax-deferred exchange[1] Addink structured for Peters. It was ultimately determined that the exchange did not qualify for deferred tax treatment under § 1031, resulting in significant tax liability for the Peters. The Peters filed a complaint against Addink and JCCS alleging professional negligence, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and misrepresentation. During discovery, the District Court granted Addink and JCCS a protective order preventing the Peters from obtaining certain of their pre-litigation communications. Ultimately, the court held that the two-year fraud and three-year tort claims were barred by the respective statutes of limitations, and dismissed the breach of contract claims despite the five-year or eight-year limitation periods applicable to such claims. We reverse and remand for further proceedings.

¶2    We review the following issues on appeal:

¶3    *1.    Did the District Court err in holding that the statute of limitations began to run when the real estate transactions closed?*

¶4    *2.    Did the District Court err in dismissing the Peters' breach of contract claim?*

---

[1] 26 U.S.C. § 1031 allows a taxpayer to defer recognition of capital gain that would ordinarily be due upon sale for certain types of property exchanges.

2

¶5    *3.    Did the District Court err in granting Addink and JCCS a protective order to prevent discovery of alleged work product and attorney-client communications?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶6    Roger and Carrie Peters, husband and wife, own Draggin' Y Cattle Company, a cattle ranch in Dillon. The Peters also owned Alaska Basin Grazing Association (Alaska Basin). Since the 1980s, the Peters had been clients of accountant Larry Addink, both individually and for their businesses. In March 2005, Draggin' Y and Addink, on behalf of JCCS, signed a written contract for general tax services, including compilation of month-end statements of assets, liabilities, and stockholders' equity-income tax basis, and preparing year-end tax returns. This contract stated that Addink will "inform [Peters] of any material errors that come to our attention . . . unless they are clearly inconsequential."

¶7    The origins and scope of the parties' agreements regarding the subject transaction are disputed. The Peters allege that they, along with realtor Lon Morris (Morris), consulted Addink in 2005, shortly after signing the written contract, regarding sale of Alaska Basin property in a way that would reduce tax liability, and that Addink suggested a § 1031 exchange. Addink's timesheet entries reflect that the Peters were billed in 2005 for conferences in which a § 1031 exchange for Alaska Basin property was discussed. Addink asserts his 2005 timesheet entries were related to a completely different transaction, and that his first involvement in this matter was in late 2006 when Morris contacted him about whether certain property would qualify for the exchange. Regardless, Addink does not dispute that he researched the possibility of § 1031

3

treatment of Alaska Basin's sale of property and purchase of other property owned by the Peters that culminated in the transaction at issue. He concluded from his research that the transaction would qualify for § 1031 treatment, so he opined to the Peters that the exchange would be given tax-deferred treatment. Addink wrote a letter to the Peters outlining his plan and suggesting which property should be purchased as the replacement property.

¶8 In late 2006, Alaska Basin hired attorney Max Hansen (Hansen), whose practice includes § 1031 exchanges, to draft the closing documents for the transaction. The Peters assert that Hansen was not retained for any tax advice regarding the transaction, and that they instead relied solely on Addink for tax advice. Hansen likewise states that he deferred all tax advice to Addink, as the accountant involved in structuring the transaction, and repeatedly reminded Addink that he was not providing any tax advice or legal representation regarding tax issues. Nonetheless, Hansen was concerned that Addink's plan would not qualify for § 1031 treatment due to a related-party issue—the property being purchased to replace the Alaska Basin property was owned by the principals of Alaska Basin. In December 2006, Hansen conveyed his concerns to Addink, who assured Hansen that he understood the issue and had researched it.

¶9 On January 17, 2007, the Alaska Basin property was sold. On January 18, 2007, Hansen again called Addink to express his concerns about the related-party issue. Addink agreed to check into it again and call Hansen if he discovered any problems. Hansen followed up on this conversation by faxing a letter to Addink detailing his

4

concerns, and reiterating that he was not engaged for tax purposes. Addink did not contact Hansen, and the transaction for purchase of the Peters' property closed on January 22, 2007. Though the Peters were aware of Hansen's concerns, they accepted Addink's assurances that he had researched the tax implications and that the exchange would qualify.

¶10 In November 2007, Addink attended a seminar where he learned that, pursuant to a 2002 revenue ruling, the type of transaction he had structured for the Peters was prohibited by the related-party rule. He immediately notified JCCS, which in turn notified its insurer. JCCS began investigating its potential liability, and consulted with attorney Ralph Picardi sometime in 2008. During this time, the Peters were not informed that the transaction would fail to qualify under § 1031, and were billed for some of the time JCCS spent discussing the transaction's failure. At least one JCCS email during this time noted that Addink was "uncomfortable knowing what he knows and not saying anything to his client."

¶11 Addink met with the Peters on February 6, 2008, to inform them that the transaction would be taxable due to the related-party rule. Addink told the Peters that the transaction had failed to qualify under § 1031 because of new tax rulings that had changed the law on related parties. The failure of the § 1031 transaction required that the Peters report $2,862,279, and Draggin'Y report $5,692,434, of taxable gain. The Peters would face a state and federal tax bill estimated at $2.5 million within three weeks.

5

¶12 Addink devised a plan to mitigate the tax consequences by seeking an extension for the 2007 tax filings, restructuring various entities to use losses to offset the gain, and negotiating with tax authorities to settle taxes, penalties, and interest due. Pursuant to this plan, the Peters were able to eliminate through 2008 and 2009 the taxable gain by offsetting it against restructured operating losses. However, during the time it took to eliminate the taxable gain, the Peters paid over $250,000 in interest on the taxes due, sums they paid by borrowing from a bank.

¶13 To further Addink's tax mitigation plan, the Peters hired Hansen to negotiate a tax compromise with the IRS. In March 2009, Hansen informed the Peters that, during his representation on the compromise issue, he learned that Addink had misinformed them about the reason the transaction had failed to qualify. Hansen opined that Addink's change of opinion was not due to a new law on related parties, but because of a new tax-preparer penalty rule that would have resulted in liability for Addink had he reported the exchange as tax-deferred. Hansen told the Peters that Addink should have informed them immediately of the failure of the transaction to qualify so they could have completed tax planning before the end of 2007, which would have avoided significant losses to the Peters. Upon learning this, the Peters ended their relationship with Addink.

¶14 On January 21, 2011, the Peters filed a complaint against Addink and JCCS alleging professional negligence, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and misrepresentation. They also claimed that Addink breached an implied contract for structuring and advising on the § 1031 exchange, and

6

breached the provision in the 2005 written contract to inform them of any not-inconsequential errors.

¶15    Addink moved for summary judgment on the ground the claims were time barred. Addink argued that the limitations period began to run for all claims on January 22, 2007, when the last property sale closed, because that was the point when all elements of the claims had accrued.  The Peters replied that the limitations period did not begin to run until February 2008 for their tort claims, when they were first informed of the failure of the tax-deferred treatment, and until March 2009 for their fraud claim, when they learned from Hansen that Addink delayed informing them and likely misrepresented the reason for the failure.  Because the statute of limitations for breach of an express contract is eight years, and for an implied contract five years, they argued these claims were timely. The District Court granted summary judgment to Addink and JCCS on all claims.

**STANDARD OF REVIEW**

¶16    We review a district court's grant of summary judgment de novo, using the same criteria applied by the district court under M. R. Civ. P. 56.  *Tin Cup Co. Water v. Garden City Plumbing & Heating, Inc.*, 2008 MT 434, ¶ 21, 347 Mont. 468, 200 P.3d 60. Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law.  M. R. Civ. P. 56(c). The party moving for summary judgment has the initial burden to establish the absence of

7

a genuine issue of material fact and entitlement to judgment as a matter of law. *Tin Cup Co. Water*, ¶ 22.

¶17 We review a District Court's rulings on discovery matters for an abuse of discretion. *Hawkins v. Harney*, 2003 MT 58, ¶ 17, 314 Mont. 384, 66 P.3d 305.

## DISCUSSION

¶18 *1. Did the District Court err in holding that the statute of limitations began to run when the real estate transactions closed?*

¶19 The District Court held that the statute of limitations began to run in January 2007, when the properties for the exchange had been bought and sold, and the "unexpected tax liability occurred." A tort claim must be brought within a three-year period, § 27-2-204(1), MCA, while a fraud or misrepresentation claim must be brought within two years, § 27-2-203, MCA. Because the Peters did not file their claim until January 2011, the District Court dismissed the claims as filed beyond the respective statutes of limitations.

¶20 Addink argues that the District Court was correct in holding that the limitations period began in January 2007. He relies on the accrual rule, which provides that a cause of action accrues when all elements of the claim exist or have occurred. Section 27-2-102(1)(a), MCA. Generally, "all elements" includes a plaintiff's damages. *Uhler v. Doak*, 268 Mont. 191, 199-200, 885 P.2d 1297, 1302-03. Addink argues that the Peters' damages, if any, would have occurred at the time the flawed transactions closed, and thus all elements of their claims accrued at that time.

8

¶21 The Peters answer that the discovery rule should toll the limitations period for their tort causes of action until they learned in February 2008, that the exchange failed to qualify, and should likewise toll the limitations period for their fraud claim until March 2009, when they discovered Addink's alleged misrepresentation. The discovery rule provides that a limitations period does not begin until the party discovers, or in the exercise of reasonable diligence would have discovered, the facts constituting the claim. Section 27-2-102(3), MCA. However, this rule only applies when the facts constituting the claim are concealed, self-concealing, or when the defendant has acted to prevent the injured party from discovering the injury or cause. Section 27-2-102(3), MCA.[2]

¶22 In *McCormick v. Brevig*, 1999 MT 86, ¶ 101, 294 Mont. 144, 980 P.2d 603, we held that an accountant's withholding of information from a client rendered the client's potential malpractice claim self-concealing. We noted that the discovery statute "protects plaintiffs against the harsh results of having their claims barred before they even know they exist." *McCormick*, ¶ 100. We analogized to the medical malpractice case of *Blackburn v. Blue Mt. Women's Clinic*, 286 Mont. 60, 78, 951 P.2d 1, 11-12 (1997), in which a counselor failed to disclose a negative HIV test result to a patient contemplating an abortion. *McCormick*, ¶¶ 99, 100. In *Blackburn*, we held that the alleged withholding, or nondisclosure, of accurate medical information by the Clinic counselor was by its nature self-concealing. 286 Mont. at 79, 951 P.2d at 12.

---

[2] The Peters also argue that an accountant owes a fiduciary duty to his or her client such that the discovery rule must be applied to toll the statute of limitations. We decline to address this argument because we conclude that the discovery rule applies due to the self-concealing nature of the claim.

¶23    In a legal malpractice case, we held that both the discovery rule and the accrual rule are applicable when determining when the statute of limitations begins to run. *Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 39, 321 Mont. 432, 92 P.3d 620. In *Watkins Trust,* we held that the plaintiff's failure to discover the attorney's purported negligence could be excused due to the "complexity of the legal transaction involved." *Watkins Trust*, ¶¶ 41, 43. We reasoned that "a drafting attorney may not impose upon her client a duty to understand defects in a technical instrument in order to defeat a malpractice claim." *Watkins Trust*, ¶ 42. To require a layperson to recognize professional malpractice on a complex issue at the moment of its incidence would require the client to "hire a second professional to observe the work of the first, an expensive and impractical duplication, clearly destructive of the confidential relationship between the practitioner and his client." *Watkins Trust*, ¶ 42 (citation omitted).

¶24    This reasoning applies equally to the facts of this case. The rules for qualifying a transaction under § 1031 are complex and, as we reasoned in *Watkins Trust*, for the Peters to know at the time of the transaction that it would not qualify under § 1031 would have required them to retain multiple professionals, duplicating research and expense. The injury was thus concealing in nature by its complexity. Assuming the damages to the Peters accrued in January 2007, nonetheless the limitations period did not begin to run until the discovery rule was also satisfied. The discovery rule tolls the running of a statute of limitations until the facts constituting the claim have been discovered, or in the exercise of reasonable diligence, should have been discovered, when either "the facts

10

constituting the claim are by their nature concealed," or "the defendant has taken action which prevents the injured party from discovering the injury or its cause." Section 27-2-102(3), MCA.

¶25 The Peters consulted with Addink to provide expertise in structuring a tax-favorable land disposition. Addink advised the Peters that they could obtain tax-deferred treatment under § 1031 based on an exchange of certain properties that Addink identified. Addink did not equivocate or advise the Peters to consult a separate tax professional on the issue. Despite this initial advice, the Peters exercised reasonable diligence by making inquiry to Addink about the concerns raised by Hansen, but were reassured by Addink that he had researched the issue and the concerns were unfounded. Addink then withheld from the Peters information about the transaction's failure, leaving them with the mistaken impression that their transaction was properly qualified until February 2008, when he advised them that his advice had been incorrect. The Peters acted diligently but were prevented from discovering the facts constituting their tort claims until February 2008, due to the concealing nature of the injury and the actions of Addink.

¶26 Addink argues that, even under the discovery rule, the Peters knew or should have known about the transaction's failure almost immediately because Hansen, their agent, expressed his concern about the transaction and that, at a minimum, the Peters were put on inquiry notice by Hansen's warnings. Even so, the Peters did exactly that—inquire. However, Addink again took action to "prevent[ ] the injured party from discovering the

injury," § 27-2-102(3)(b), MCA, by reassuring the Peters that he had researched the problem raised by Hansen and confirming to them that the exchange transaction would qualify.

¶27 The discovery rule thus requires that the applicable three-year statute of limitations period for the tort claims began to run in February 2008. Because the complaint was filed in January 2011, within three years, the Peters' tort claims were timely filed.

¶28 Regarding the claim for misrepresentation, the Peters argue that the two-year statute of limitations period did not begin to run until March 2009, when they were advised by Hansen that Addink had delayed telling them about the failure under § 1031, misrepresented the reason for the failure, and waited too long to inform them of the failure for the Peters to be able to respond most advantageously to avoid the potential damages. Addink argues that at the time he disclosed the tax consequences to the Peters in February 2008, they had all the facts necessary to make out a claim for fraud or misrepresentation. He points to the letter he sent to the Peters following the February 2008 meeting, stating "[i]n late 2007, I attended a seminar and workshop where [related-party] exchanges were discussed, and recent revenue rulings are now stating that the Internal Revenue Service is disallowing these exchanges between related parties." Also, Addink emailed Hansen in February 2008, and provided citations to the revenue rulings upon which he based his conclusion that the exchange did not qualify under §

12

1031, and faxed the materials he received at the seminar to Jock Anderson, another tax attorney hired by the Peters to review the situation.

¶29 We have held that when material issues of fact exist about when a party discovered or reasonably should have discovered all the facts necessary to make out a claim, that issue is a question of fact for the jury. *Young v. Datsopoulos*, 249 Mont. 466, 473, 817 P.2d 225, 229 (1991). The parties have raised material issues of fact regarding when the Peters knew or should have known all the facts necessary to make out a claim for misrepresentation against Addink. Whether the information and materials provided by Addink in 2008 were sufficient for the Peters to have discovered with the exercise of reasonable diligence the facts constituting their misrepresentation claim is a question of material fact that a jury must resolve.

¶30 We reverse the District Court's summary judgment on the Peters' tort claims. We also reverse the entry of summary judgment on the Peters' misrepresentation claim and remand the issue of the application of the two-year statute of limitations for a jury determination.

¶31 *2. Did the District Court err in dismissing the Peters' breach of contract claim?*

¶32 The statute of limitations for a claim of breach of a written contract is eight years. Section 27-2-202(1), MCA. The statute of limitations for a breach of an implied contract is five years. Section 27-2-202(2), MCA. Although the Peters brought suit alleging breach of contract four years from the date the transaction closed, the District Court dismissed this claim.

13

¶33 A claim for breach of a professional service contract can sound in either contract or tort. *Tin Cup Co. Water*, ¶ 25 (citing *Northern Mont. Hosp. v. Knight*, 248 Mont. 310, 315, 811 P.2d 1276, 1278-79 (1991)). When the facts warrant either type of action, potential liability for tort may coexist with liability in contract. *Billings Clinic v. Peat Marwick Main & Co.*, 244 Mont. 324, 339, 797 P.2d 899, 908-09 (1990).

> Like other professionals, the accountant usually gets into the position where he must exercise his professional skill as the result of a contract. The contract says what he has undertaken to do, but the law says that he must do it with reasonable care, by professional standards. If he fails, he may be liable either for breach of his contract or in tort, for breach of the general duty to exercise due care arising out of the contract relationship.

*Billings Clinic*, 244 Mont. at 339, 797 P.2d at 909 (quoting Carl S. Hawkins, *Professional Negligence Liability of Public Accountants*, 12 Vand. L. Rev. 797, 797 (1959)).

¶34 In *Billings Clinic*, a jury found an accounting firm had breached its implied contract with the clinic by failing to recognize substantial tax implications that resulted from a proposed corporate reorganization. We rejected the accounting firm's argument that the verdict should be overturned. The firm had argued that the clinic had only a tort claim because no express contract existed and the parties never negotiated or agreed to the scope of the firm's engagement. *Billings Clinic*, 244 Mont. at 337-39, 797 P.2d at 908-09.

¶35 Our prior cases dismissing a contract cause of action on the basis that the claim properly sounded in tort have dealt with situations where the tort statute of limitations has passed and the nature of the action did not support a breach of contract claim. *E.g. Tin Cup Co. Water*, ¶ 36; *Erickson v. Croft*, 233 Mont. 146, 153-54, 760 P.2d 706, 710-11

14

(1988); *Bennett v. Dow Chem. Co.*, 220 Mont. 117, 122, 713 P.2d 992, 995 (1986). In such a case, the court must determine from "the substance of the complaint" whether the nature of the action supports the theory chosen by the plaintiff. "[O]nly if the gravamen of [the] complaint sounds in contract" may the plaintiff be allowed to pursue a contract cause of action and utilize the longer limitations period. *Tin Cup Co. Water*, ¶ 30. As we have already concluded that the tort statute of limitations period has not expired, no argument can be made here that the Peters are attempting to mislabel their action to avoid summary judgment on statute of limitations grounds. No authority has been presented to support dismissal of a claim, when the elements of the claim have been made out, in favor of a "better" claim.

¶36     As in *Billings Clinic*, we would need "[a] scissors more sharp than we command . . . to pare away the contract implications from the tort claim here." 244 Mont. at 339, 797 P.2d at 909. The Peters allege that they have a written contract, signed in 2005, requiring Addink to inform them of any not-inconsequential errors or mistakes. They also claim an implied contract to research the requirements of § 1031 and how best to structure a land exchange to take advantage of tax-deferred treatment. Ultimately, whether a contract existed between the parties, and whether such contract was breached, are questions properly left to a jury. However, it is clear that the Peters have properly stated a claim for breach of contract and that the claim is not time barred. The District Court erred in dismissing the claim.

¶37     *3.     Did the District Court err in granting Addink and JCCS a protective order to prevent discovery of alleged work product and attorney-client communications?*

15

¶38 During discovery, the Peters sought certain records that Addink and JCCS claimed to be protected work product or covered by attorney-client privilege. The records include communications between Addink or JCCS and its attorneys (Picardi and G. Patrick HagEstad), Addink or JCCS and insurance adjusters, insurance adjusters and Picardi, and internal insurance company communications, as well as minutes from JCCS shareholder and director meetings during which the Peters' failed § 1031 exchange was discussed. In response, Addink sought a protective order, which was granted by the District Court and later upheld after the court conducted an *in camera* inspection. The court found there was no "material relevant and discoverable" in the documents. We conclude that the court abused its discretion by doing so without having sufficient facts before it to determine the applicability of these privileges. We note that the law in this area is sparse, and provide the following discussion for guidance on remand.

¶39 As a preliminary matter, Addink argues the Peters failed to preserve this order for appeal because the Peters did not specifically list the February 6 or March 8, 2012 protective orders in their Notice of Appeal. However, Rule 4(4)(A) of the Montana Rules of Appellate Procedure clearly provide that "[a]n appeal from a judgment draws into question all previous orders and rulings excepted or objected to which led up to and resulted in the judgment." A protective order denying discovery of certain documents is the type of interlocutory order encompassed by this rule. *See e.g. State ex rel. Guar. Ins. Co. v. Dist. Ct. of Eighth Jud. Dist.*, 194 Mont. 64, 67-68, 634 P.2d 648, 650 (1981)

16

(ordinarily District Court orders on discovery matters are part of the day-to-day administration of the case and not subject to interlocutory appeal).

### A. Attorney-Client Privilege

¶40 The attorney-client privilege protects confidential communications between an attorney and client. Section 26-1-803, MCA. Its purpose is to "'encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy depends upon the lawyer's being fully informed by the client.'" *State ex rel. U.S. Fidelity & Guar. Co. v. Second Jud. Dist. Ct.*, 240 Mont. 5, 10, 783 P.2d 911, 914 (1989) (quoting *Upjohn Co. v. U.S.*, 449 U.S. 383, 389, 101 S. Ct. 677, 682 (1981)).

¶41 "[T]he privilege must be construed narrowly because it obstructs the truth-finding process. The privilege 'protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege.'" *Am. Zurich Ins. Co. v. Thirteenth Jud. Dist. Ct.*, 2012 MT 61, ¶ 10, 364 Mont. 299, 280 P.3d 240 (quoting *Fisher v. U.S.*, 425 U.S. 391, 403, 96 S. Ct. 1569, 1577 (1976)). Generally, the privilege only extends to communications made between attorney and client, however there are exceptions that permit extension of the privilege to communications involving third parties. *Am. Zurich Ins. Co.*, ¶ 11.

¶42 In *In re Rules of Professional Conduct*, 2000 MT 110, 299 Mont. 321, 2 P.3d 806, we were asked to decide whether an insurer and an insured are co-clients of an

17

insurer-appointed attorney under the Montana Rules of Professional Conduct. Though we concluded that the Rules prohibited an insurer being accorded client status, *In re Rules*, ¶ 38, we recognized "a privileged community or magic circle within which confidential information may be shared without waiver of attorney-client or work product privilege." *In re Rules*, ¶¶ 28, 33, 57 (citing *Second Jud. Dist. Ct.*, 240 Mont. at 10, 783 P.2d at 914) We also discussed *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508 (D.C. Cir. 1993), regarding how far the "magic circle" extends. *In re Rules*, ¶ 64. The court in *Linde Thomson* noted that "[f]ederal courts have never recognized an insured-insurer privilege as such." 5 F.3d at 1514 (citations omitted). While rejecting a blanket extension of attorney-client privilege to communications between an insurer and its insured, the court recognized that due to the essential purpose of the privilege—obtaining legal advice from a lawyer—"where the insured communicates with the insurer for the express purpose of seeking legal advice with respect to a concrete claim, or for the purpose of aiding an insurer-provided attorney in preparing a specific legal case" application of the attorney-client privilege is appropriate as an extension to those employed to assist the attorney. *Linde Thomson*, 5 F.3d at 1514-15 (citations omitted). "However, a statement betraying neither interest in, nor pursuit of, legal counsel bears only the most attenuated nexus to the attorney-client relationship . . . *[I]f what is sought is not legal advice, but insurance, no privilege can or should exist*." *Linde Thomson*, 5 F.3d at 1515 (citations omitted; emphasis added).

18

*B. Work Product*

¶43     Montana Rule of Civil Procedure 26(b)(3), commonly referred to as the work product doctrine, protects from disclosure documents that are "prepared in anticipation of litigation or for trial." Montana's rule is identical to its federal counterpart. *Cantrell v. Henderson*, 221 Mont. 201, 208, 718 P.2d 318, 322 (1986). The work product rule is broader than the attorney-client privilege. *Kuiper v. Dist. Ct. of Eighth Jud. Dist.*, 193 Mont. 452, 462, 632 P.2d 694, 700 (1981). There are two types of work product. Ordinary work product relates to factual matters and is only discoverable upon a showing of substantial need "to the extent that it is not privileged and is 'relevant to the subject matter involved in the pending action.'" Opinion work product relates to the mental impressions, opinions, conclusions or legal theories of counsel and is given additional protection. *Palmer by Diacon v. Farmers Ins. Exch.*, 261 Mont. 91, 115-16, 861 P.2d 895, 910 (1993) (citation omitted).

¶44     Whether something qualifies as work product is largely a case-by-case determination. "[I]t must be determined whether, in the light of the nature of the document and factual situation in a particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Clark v. Norris*, 226 Mont. 43, 50, 734 P.2d 182, 186 (1987) (citations omitted). The core purpose of the work product doctrine is to "'shelter[ ] the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.'" *Palmer by*

*Diacon*, 261 Mont. at 116, 861 P.2d at 910 (quoting *U.S. v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 2170 (1975)).

¶45    In *Kuiper*, we held that work product protects "impressions [of an attorney] rendered during the investigation of a claim where no litigation is in progress." 193 Mont. at 465, 632 P.2d at 701. We agreed that various memoranda and correspondence to and from corporate in-house counsel was work product "from the time the claim file [wa]s opened" because "[w]hen a claim file is opened, there is always some prospect of litigation and an investigation must be conducted geared to the ultimate eventuality of litigation." 193 Mont. at 465, 632 P.2d at 701.

¶46    In *Cantrell*, we declined to extend this rule to situations where an insurance company claim file had been opened but no attorney was yet involved. 221 Mont. at 208, 718 P.2d at 322. We refused to recognize work product protection for the statement of an employee to the employer's insurance company. We noted that no complaint had been filed and no attorney had been hired at the time the statement was given, and the statement was not given at the request of an attorney. Because "[a]n insurance company claim file is not the same as an attorney's claim file, for purposes of the work product rule," we held that the statement was not "made in anticipation of litigation" as contemplated by Rule 26(b)(3). *Cantrell*, 221 Mont. at 208, 718 P.2d at 322.

¶47    Other courts, applying the federal rule or a state counterpart, have agreed that investigation of potential claims by an insurance company does not automatically satisfy the requirement of "prepared in anticipation of litigation," even though a suit may

20

eventually follow. "A litigant must demonstrate that documents were created with a specific claim supported by concrete facts which would likely lead to litigation in mind, not merely assembled in the ordinary course of business or for other nonlitigation purposes." *Linde Thomson*, 5 F.3d at 1515 (quotation omitted; citing *Petersen v. Douglas Co. Bank & Trust Co.*, 967 F.2d 1186, 1189 (8th Cir. 1992); McDougall v. Dunn, 468 F.2d 468, 473 (4th Cir. 1972) (holding that two and one-half year time lapse between witness statements to insurance adjuster and ensuing litigation demonstrated the communications were not in anticipation of litigation but in ordinary course of business). *See also* 27 C.J.S. *Discovery* § 124 (2009) (the privilege "extends only to documents that are prepared for, or placed in the hands of, an attorney in reference to an existing or anticipated controversy . . . [T]he privilege extends only to writings prepared during, and because of, the relation of attorney and client."); *Lanelogic, Inc. v. Great Am. Spirit Ins. Co.*, 2010 U.S. Dist. LEXIS 44392 at 13-15, 2010 WL 1839294 (N.D. Tex. May 6, 2010) (insurance investigative records held not work product because not created in anticipation of litigation but rather for ordinary business purpose of determining if coverage existed); *Mole v. Millard*, 762 S.W.2d 251, 254 (Tex. App. Houston 1988) (documents in claim files of hospital and its insurer not work product because "no evidence showing any involvement of an attorney in the case prior to or during the generation of the documents"); *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, 247 F.R.D. 656, 657-58 (D. Kan. 2007) ("Certainly by implication the . . . rule precludes any idea of extending the work product doctrine to reports or statements, even if written, obtained by the client or his

21

investigators which are not prepared under the supervision of an attorney in preparation for trial.").

¶48    In *Lanelogic*, the court noted that determining whether a document is prepared in anticipation of litigation is a "slippery task."  2010 U.S. Dist. LEXIS 44392 at 13.  The court proposed factors to be considered in determining whether the primary motivation was preparation for litigation, including "the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance."  *Lanelogic*, 2010 U.S. Dist. LEXIS 44392 at 14 (citations omitted).  *See also Natl. Eng. & Contr. Co. v. C & P Eng. & Mfg. Co.*, 676 N.E.2d 372, 378 (Ind. Ct. App. 1997) (photographs taken by defendant's employees were not work product, but rather taken in ordinary course of business because even though there was the "potential" for a claim it was not "substantial and imminent . . . Litigation cannot be imminent when one party does not have knowledge of the facts that would give rise to a cause of action."); *Columbia/HCA Healthcare Corp. v. Eighth Jud. Dist. Ct.*, 936 P.2d 844 (Nev. 1997) (occurrence reports regarding treatment of child in medical malpractice case created following a request for investigation from hospital's attorney were ordinary business documents rather than work product because hospital policy required employees to fill out pre-printed forms as standard practice when any "unexpected occurrence" happened to help improve the quality of care).

¶49 Here, the District Court simply held there was no relevant or discoverable information in the protected documents. However, the information sought appears to be "reasonably calculated to lead to the discovery of admissible evidence." M. R. Civ. P. 26(b)(1). Jerry Lehman, the Chief Executive Officer of JCCS, admits that, during the time prior to attorney involvement, the communications with the insurer involved the facts giving rise to a potential claim as well as JCCS's potential exposure, that is, "steps JCCS was taking with regards to notifying the Peters of the issue and steps JCCS was taking to mitigate tax ramifications." This kind of information would be potentially relevant for the Peters' claim of misrepresentation for the delay in informing them of the problem, as well as the possibility that an earlier disclosure would have prevented significant losses. It may also be relevant to the issue of when the Peters knew or should have known about the potential misrepresentation claim.

¶50 Further analysis and perhaps fact finding are necessary to determine which documents are discoverable and which qualify for work product or attorney-client protection. For work product privilege it should be determined whether the various records were created or obtained due to the prospect of litigation or in the ordinary course of business for JCCS or the insurer. For attorney-client privilege the court should determine whether the communications not involving an attorney were made for the ultimate purpose of seeking legal advice. We understand that the time district courts have for resolution of discovery disputes is limited. However, that cannot permit

23

application of overbroad protective orders that fail to account for the limits of the privileges. This case will require a closer look.

¶51 The District Court's order granting summary judgment on all claims is reversed. The Peters' tort and breach of contract claims were timely filed and are remanded for further proceedings. We remand the misrepresentation claim for a determination by the fact finder of when the Peters knew or should have known all the facts necessary to make out the claim. The District Court's order granting Addink and JCCS a protection order is likewise reversed, and remanded for further proceedings consistent with this opinion.


/S/ JIM RICE


We concur:


/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON
/S/ BETH BAKER