DA 14-0120

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 247

RICHARD THIELTGES, individually
and on behalf of THIELTGES FARMS,
INCORPORATED,

        Plaintiffs and Appellants,

   v.

ROYAL ALLIANCE ASSOCIATES, INC.,

        Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDV 2011-346
Honorable James P. Reynolds, Presiding Judge
Cause Nos. BDV 2011-535, BDV 2012-446
Honorable Jeffrey Sherlock, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            Linda M. Deola, Morrison, Sherwood, Wilson, & Deola PLLP, Helena,
Montana

        For Appellee:

            Alan L. Joscelyn, KD Feeback, Gough, Shanahan, Johnson & Waterman,
PLLP, Helena, Montana

            Sean Connelly, Katherine A. Roush, Reilly Pozner, LLP; Denver,
Colorado

        For Amicus Curiae:

            Jesse Laslovich, Jameson C. Walker, Nicholas Mazanec, Office of the
Commissioner of Securities and Insurance, Montana State Auditor,
Helena, Montana

                      Submitted on Briefs:  August 20, 2014
                           Decided:  September 16, 2014

Filed:

                           Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 This is the consolidated appeal of orders granting summary judgment in favor of Royal Alliance Associates, Inc., with respect to claims brought by Chevallier Ranch Company, Schindler Livestock, and Richard Thieltges, individually and on behalf of Thieltges Farms, Inc.

¶2 The issue presented for review is whether the facts constituting Appellants' claims against Royal Alliance were, by their nature, concealed or self-concealing such that they could not have been discovered in the exercise of due diligence.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Chevallier and Schindler are Montana ranching organizations. Thieltges is a retired third-generation family farmer. During 2003 and 2004, Chevallier, Schindler, and Thieltges each sought the advice of accounting firm Anderson ZurMuehlen & Co., P.C. (AZ) regarding sales of their respective farm and ranch properties. Each met with Ray Petersen, a certified public accountant and a shareholder in AZ. Petersen also worked with Acquiron, a subsidiary real estate brokerage firm co-founded by AZ and real estate broker Rick Ahmann. In addition to his roles within AZ and Acquiron, Petersen was a licensed securities salesperson registered with Royal Alliance from 2002 through 2005.

¶4 Acquiron was in the business of selling tenants-in-common (TIC) investments designed to take advantage of the tax-deferral benefits of a "1031 exchange."[1] The TIC investments sold by Acquiron promised investors that they could defer tax liability on the

_____

[1] Section 1031 of the Internal Revenue Code allows deferral of recognition of capital gains for certain types of property exchanges. A TIC investment is a joint investment in real property wherein each investor owns an undivided fractional share of the property.

2

gains realized from the sale of real property by reinvesting the proceeds in shares of commercial properties around the country. The commercial properties would be managed by DBSI Housing, Inc., and its subsidiaries. In addition to the tax-deferral benefits, investors would receive monthly payments from the lease revenues collected by DBSI. Investors were told they would receive returns on their investment of 6% to 7% annually, a rate which was expected to increase as the properties appreciated in value. Investors were also told that a substantial cash reserve was in place to ensure payment even if the properties could not be leased immediately.

¶5 Petersen advised Chevallier, Schindler, and Thieltges that Acquiron's TIC investments would allow them to defer taxation on the proceeds from the sale of their respective farm and ranch properties while also providing a reliable monthly income. Chevallier entered a written contract with Acquiron in October 2004, and the following month invested in the Metcalf 103, ACI Building, and Corporate Center I properties, paying $1,491,054.16 in cash and assuming debt of $919,462.58. Schindler entered contracts with Acquiron in March 2003 and August 2004. In December 2004, Schindler invested in the Metcalf 103, Missouri Falls, and 48 Perimeter properties, paying $1,587,730.00 in cash and assuming debt of $1,452,130.00. Thieltges entered a written contract with Acquiron in November 2004. In January 2005, Thieltges invested in the Northridge Center I & II, Progress Center 7, and Executive Park properties, paying $1,113,493.04 in cash and assuming debt of $1,267,601.26.

¶6 In October 2008, Chevallier, Schindler, and Thieltges each received form letters addressed to "Dear Investor," informing them that the properties were not generating

sufficient cash flow to allow continued payments to investors. Soon after, DBSI filed for bankruptcy. Payments on the Chevallier and Thieltges properties ceased in October 2008. One of Schindler's properties stopped paying in October 2008. Schindler's other properties continued to pay at a greatly reduced rate until 2011.

¶7 On April 6, 2011, Thieltges filed a complaint in the District Court naming AZ, Petersen, Ahmann, Ahmann's real estate brokerage firm, and Acquiron as defendants. Thieltges alleged negligence, negligent misrepresentation, breach of fiduciary duty, breach of contract, contractual breach of the implied covenant of good faith and fair dealing, and tortious breach of the covenant of good faith and fair dealing. Thieltges also sought punitive damages. On May 23, 2011, Chevallier filed a complaint naming the same defendants and containing the same allegations. Thieltges and Chevallier were represented by the same attorney.

¶8 Petersen was deposed by Chevallier on February 2, 2012. During that deposition, Petersen stated he had been registered as a securities salesperson with Royal Alliance until late 2005. Chevallier and Thieltges were not aware of Petersen's relationship with Royal Alliance until this deposition. On April 23, 2012, Chevallier and Thieltges amended their complaints, naming Royal Alliance as a defendant and adding claims of respondeat superior and negligent supervision. Chevallier and Thieltges alleged that Royal Alliance violated its affirmative duty to supervise Petersen's activities. Meanwhile, Schindler, who had previously hired attorneys in the states where each of his properties were located, decided instead to hire the attorney representing Chevallier and Thieltges. On June 6, 2012, Schindler filed a complaint in the District Court naming the

same defendants and stating the same claims as Chevallier and Thieltges. The Chevallier and Schindler cases were assigned to Judge Sherlock. The Thieltges case was assigned to Judge Reynolds.

¶9 On July 5, 2012, this Court issued its opinion in *Redding v. First Judicial District Court*, which held that the TIC investments sold by Acquiron were securities under the Securities Act of Montana. *Redding v. First Jud. Dist. Ct.*, 2012 MT 144A, ¶ 56, 365 Mont. 316, 281 P.3d 189. All defendants but Royal Alliance settled with Chevallier, Schindler, and Thieltges soon after. Royal Alliance moved to dismiss each of the complaints on statute of limitations grounds, arguing that the injuries forming the basis of the complaints occurred in October 2008, when DBSI announced it would stop making payments to investors. Royal Alliance argued the claims were subject to the three-year tort statute of limitations, and it had not been named in any of the complaints until three and a half years after the injuries became known.

¶10 In a combined order in the Chevallier and Schindler cases, Judge Sherlock ruled that the three-year tort statute of limitations was applicable. Judge Sherlock also found Royal Alliance had not affirmatively concealed its involvement in a manner that would delay running of the statute of limitations. He declined, however, to dismiss the complaints, saying that more facts were needed to determine when the claims accrued. In the Thieltges case, Judge Reynolds adopted "in toto" the statute of limitations analysis set forth in Judge Sherlock's order, and similarly declined to dismiss the complaint.

¶11 Following discovery, Royal Alliance moved for summary judgment in all three cases, again raising the statute of limitations. Judge Sherlock granted summary judgment

5

in favor of Royal Alliance in the Chevallier and Schindler cases, finding that their claims had accrued in October 2008, when they became aware their investments were failing. Judge Sherlock noted that both Chevallier and Schindler consulted attorneys soon after receiving the October 2008 letters and were clearly aware they had been injured. Judge Reynolds also granted summary judgment in favor of Royal Alliance in the Thieltges case, adopting the analysis and conclusions stated by Judge Sherlock. Chevallier, Schindler, and Thieltges appealed to this Court, and the cases were consolidated into this proceeding.

## STANDARD OF REVIEW

¶12 Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3); *Stanley L. & Carolyn M. Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 16, 321 Mont. 432, 92 P.3d 620. This Court reviews a district court's grant of summary judgment de novo, applying the same M. R. Civ. P. 56 criteria as the district court. *Draggin' Y Cattle Co. v. Addink*, 2013 MT 319, ¶ 16, 372 Mont. 334, 312 P.3d 451.

## DISCUSSION

¶13 *Whether the facts constituting Appellants' claims against Royal Alliance were, by their nature, concealed or self-concealing such that they could not have been discovered in the exercise of due diligence.*

¶14 Chevallier, Schindler, and Thieltges claim Royal Alliance had information about Petersen's sales of TIC investments which, if disclosed, would have prevented their injuries. They claim Royal Alliance violated affirmative duties to disclose that information and that this breach of duty is self-concealing in nature, thereby tolling the

6

statute of limitations. On appeal, Chevallier, Schindler, and Thieltges do not contest that the three-year statute of limitations governing tort actions, § 27-2-204(1), MCA, is applicable to their claims against Royal Alliance.

¶15 The general rule in Montana is that a claim accrues and the limitation period begins to run when all elements of the claim exist or have occurred. Section 27-2-102, MCA; *Draggin' Y Cattle Co.*, ¶ 20. Lack of knowledge of the existence of a claim or of the facts from which the claim arises does not delay the running of the statute of limitations. *Bennett v. Dow Chem. Co.*, 220 Mont. 117, 120-21, 713 P.2d 992, 994 (1986). If the facts constituting the claim are, by nature, concealed or self-concealing, or if the defendant has acted to prevent discovery of the facts constituting the claim, the claim does not accrue until those facts are, or in the exercise of due diligence should have been, discovered. Section 27-2-102(3), MCA.

¶16 In *Draggin' Y Cattle Co.*, we addressed whether an injury was self-concealing where an accountant failed to disclose that a § 1031 exchange he had structured ultimately failed to qualify for tax-deferred treatment. *Draggin' Y Cattle Co.*, ¶¶ 24-25. The plaintiffs owed an additional $2.5 million in state and federal taxes as a result. *Draggin' Y Cattle Co.*, ¶ 11. They were not informed of the failure of the proposed § 1031 exchange or their increased tax liability until over a year after the transaction had been completed. *Draggin' Y Cattle Co.*, ¶ 11. Another year after that, they became aware that the accountant had misrepresented the reason the transaction failed to qualify. *Draggin' Y Cattle Co.*, ¶ 13. We held that the complexity of the transaction in that case made the injury self-concealing in nature. *Draggin' Y Cattle Co.*, ¶ 24. The plaintiffs

7

had hired an accountant specifically to provide expertise in structuring tax-deferred transactions, and they were entitled to rely on that expertise. *Draggin' Y Cattle Co.*, ¶ 25. We held that the limitations period therefore began to run from the time the plaintiffs discovered the failure of the § 1031 exchange and their additional tax liability. *Draggin' Y Cattle Co.*, ¶ 25.

¶17 Similarly, in *Watkins Trust*, we held that the plaintiffs' failure to discover an attorney's alleged negligence could be excused due to the complexity of the transaction involved. *Watkins Trust*, ¶ 41. In that case, an attorney was hired to draft wills and a trust agreement on behalf of a husband and wife; three years later, it was discovered that the instruments were defective. *Watkins Trust*, ¶¶ 7-13. We cited with approval the statements of the California Supreme Court that "[c]orollary to [the attorney's] expertise is the inability of the layman to detect its misapplication; the client may not recognize the negligence of the professional when he sees it." *Watkins Trust*, ¶ 42 (citing *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 491 P.2d 421, 428 (Cal. 1971)).

¶18 In both *Draggin' Y Cattle Co.* and *Watkins Trust*, the complexity of the underlying transactions served to conceal the injuries themselves. *Draggin' Y Cattle Co.*, ¶ 24; *Watkins Trust*, ¶ 41. By contrast, in *Bennett*, the plaintiff suffered immediately apparent injuries as a result of exposure to chemical herbicides. *Bennett*, 220 Mont. at 119, 713 P.2d at 993-94. While the injury itself was immediately known, the plaintiff did not become aware of all potential defendants and legal claims until years later. *Bennett*, 220 Mont. at 120, 713 P.2d at 994. We held that there was no precedent to allow tolling of

8

the statute of limitations until a plaintiff discovered his legal rights. *Bennett*, 220 Mont. at 121, 713 P.2d at 995.

¶19 Chevallier, Schindler, and Thieltges became aware of their injuries in October 2008, when they were informed that they would no longer receive payments on the underperforming TIC properties. Unlike the circumstances addressed in *Draggin' Y Cattle Co.* and *Watkins Trust*, the alleged breach of duty by Royal Alliance did not prevent Appellants from discovering that their investments were failing. *See Draggin' Y Cattle Co.*, ¶ 24; *Watkins Trust*, ¶ 41. Instead, as in *Bennett*, Appellants were aware they had been injured, but were unaware of their potential claims against an additional defendant. *See Bennett*, 220 Mont. at 120, 713 P.2d at 994. The facts constituting those claims were neither concealed nor self-concealing. Despite Appellants' assertion in their reply brief on appeal that "there is no question that Appellants had no notice that Petersen was registered as a securities salesperson until February of 2012," the complaints filed in the spring of 2011 include the statement that "[a]t all material times, Petersen was licensed as a securities salesperson in Montana." Appellants could readily have discovered through public records that Petersen was registered with Royal Alliance during the relevant period. Although Appellants claim "knowledge of Petersen's association would not have revealed Royal Alliance's concealment of information," such knowledge would surely have prompted further timely inquiry. Moreover, knowledge of Royal Alliance's alleged concealment was not necessary to state a claim against Royal Alliance under the doctrine of respondeat superior for the actions of its agent, Petersen.

9

¶20     The facts constituting Appellants' claims against Royal Alliance could have been discovered in the exercise of due diligence. *See* § 27-2-102(3), MCA. Appellants' lack of knowledge of their claims against Royal Alliance did not delay the running of the limitations period, which began when Appellants discovered their injuries in October 2008. *See* § 27-2-102, MCA. No claims were brought against Royal Alliance until more than three years after this date. *See* § 27-2-204, MCA. The District Court did not err by granting summary judgment in favor of Royal Alliance.

¶21     Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA

10